[Civ. No. 14606.   First Dist., Div. One.   June 29, 1951.]

STANLEY HILLER et al., Appellants, v. JOSEPH H. KING et al., Respondents.

Sherman & Peters for Appellants.

Huovinen & Koford for Respondents.

PETERS, P. J.—The Hillers, as purchasers of a 50-acre tract of land from the Kings, alleging that the Kings had breached the contract, brought this action for its rescission, to cancel the deed of trust and promissory notes given by them in connection with the purchase, to recover moneys already paid, and to recover damages. The trial court gave judgment for the defendants, and plaintiffs appeal.

In the year 1934 appellants purchased from the respondents three and one-half acres of land adjoining the Tunnel Road in Oakland, and appellants constructed a home on this parcel. Adjoining this property was another parcel consisting of 50 acres owned by the respondents. Mrs. West, also referred to as Mrs. McGowan, and admittedly the manager and agent of the respondents, tried to interest the appellants in purchasing this parcel as a protection to their home property. These discussions were rather desultory until 1944 and 1945 when they became serious. During these discussions Hiller told Mrs. West that any purchase agreement would have to contain a release clause so that Hiller could sell the land in parcels if he so desired. Mrs. West agreed to this on condition that any release plan must be satisfactory to respondents. In fact, Mrs. West suggested that the agreement embody a specific release plan, and suggested the basis for such a plan, but Hiller objected because he did not want to tie himself down to any one plan until he had decided what he wanted to do with the tract.

On May 10, 1945, the C. H. King Estate Company, the owner of the property, by proper resolution, authorized Mrs.

West to offer the property to Hiller for $67,500, payable $5,000 down, $10,000 within six months, and the balance within five years, deferred payments to be secured by a deed of trust and promissory note drawing interest at 4½ per cent, payable quarterly. The resolution also authorized Mrs. West to make provision in the agreement "for partial release of any portion or portions of the property sold on such basis as may hereafter be mutually agreeable to the corporation and to said Stanley Hiller." Under date of May 16, 1945, Hiller and the King Corporation entered into an agreement embodying the terms set forth in the above-mentioned corporate resolution. Clause 5 of this agreement, which was apparently drafted by Hiller, reads as follows: "It is understood and agreed that in the event first party, from time to time, desires to obtain release from the lien of said deed of trust any portion or portions of the property hereunder, the minimum sum payable by first party to secure such release will be on such basis as may hereafter be mutually agreed upon by the parties hereto, and all payments on account of portions of the property so released will be credited upon the said purchase price and upon the note given in evidence thereof."

After the agreement was entered into Hiller started to develop the property. He was informed by an architect that a prior plan that had been worked out by the Kings was impractical, and another plan was suggested by the architect. Pursuant to this plan, in 1946, certain roads were constructed on the property. During that summer Hiller employed attorney Franklin Brown to work out with respondents an acceptable plan of releases consistent with clause 5 of the contract so that Hiller could sell several parcels to persons who had evidenced an interest. Pursuant to this employment Brown had several conversations with Mrs. West and with Harold Huovinen, the attorney for respondents. Brown and Huovinen arrived at what appeared to them to be a fair release agreement covering the entire 50 acres. This plan, for release purposes, divided the 50 acres into 29 parcels, and fixed a price for each parcel for releasing that parcel from the underlying deed of trust. The prices so fixed in the aggregate totalled 140 per cent of the balance owed on the property, which balance was then $52,500. On September 18, 1946, Brown wrote to Huovinen as follows:

"I enclose herewith draft of a proposed agreement for release of individual parcels of property from the deed of trust held by the King heirs, following the lines of our dis-

cussions on the telephone. A map and schedule of proposed release prices are attached. You will note that the total of the release prices is $73,550.00. This is approximately 140% of $52,500.00, which is, I am advised, the amount at present unpaid on the Hiller's note.

"Although Mr. Hiller intends to retain the 12.13 acres adjoining his home, a release price has been entered for each of these acres in order to allocate the release amounts over the entirety of the property subject to the deed of trust.

"The enclosed draft is merely a suggestion and I shall be glad for your comments."

On September 20, 1946, Huovinen wrote to Brown as follows:

"In reply to your favor of September 18th, please be advised that I have this day forwarded the proposed release agreement to one of the three King heirs. I will submit it to each of the other heirs in due course and after I have the views of each of them pertaining to the proposal I will get into further communication with you.

"Personally, I think the agreement in its proposed form is just about satisfactory."

The respondents, however, were unwilling to approve the proposed release plan mainly because they believed that the roads already constructed had adversely affected the value of the property, and they were afraid that the most attractive parcels would be sold and the less attractive parcels would not be sold, thus imperilling the security for the balance of the purchase price. Under date of October 2, 1946, Huovinen wrote to Brown as follows:

"After receipt of the proposed form of releasing Agreement I forwarded the same to Mr. Charles H. King, one of the owners of the Hiller note, for his consideration. He considered the same together with his sister, Pearl King Tanner, and they both agreed that they did not wish to enter into a releasing Agreement at this time. Because of this reaction, I did not deem it necessary to submit the agreement to the third co-owner, Joseph H. King.

"It seems that Mr. Charles H. King and Mrs. Tanner feel that since the note contains provisions allowing Mr. Hiller to pay off the same before its due date that he should do so if he intends to carry out his decision to subdivide.

"Under the circumstances, it would appear that Mr. Hiller will have to refinance his note with some bank or other lending

agency in the event that he goes forward with the subdivision.''

Brown, under date of October 9, 1946, wrote to Huovinen as follows:

''This will acknowledge receipt of your letter of October 2nd conveying the refusal of the King heirs to enter into any release agreement respecting the property sold Mr. Stanley Hiller.

''I have advised Mr. Hiller of the contents of your letter, and he has drawn my attention to an agreement dated May 16, 1945, entered into with the Kings contemporaneously with the sale of the above property. It is possible that you did not know of this agreement, and I would like to direct your attention to paragraph five thereof, which reads as follows:

[Here follows clause 5 of the original agreement.]

''As you know, it is both a practical and a legal impossibility to subdivide property without providing for the release of any parcels sold from an over-all deed of trust. The Kings knew that Mr. Hiller intended to subdivide the above property when they sold it to him. One of the things which induced Mr. Hiller to buy the property was their promise that they would enter into a release agreement; in fact, Mr. Hiller would never have bought the property if he had not had an assurance from the Kings that they were willing to enter into such an agreement. The only possible use for a large and expensive piece of residential property like this was subdivision, which would have been impossible without the Kings' agreement to enter into a release arrangement.

''I am advised that the Kings repeated their promise to enter into a release agreement earlier this year when Mr. Hiller was formulating plans for subdividing the property. Mr. Hiller relied on their promises and went forward with improvements for subdivision purposes. The Kings have known of this work for some time. Mr. Hiller has already paid out large sums on improvements, and has committed himself to expend further amounts.

''My negotiations with you, as the Kings' attorney, have been carried on since I first talked to you on September 3rd on the assumption that the Kings were agreeable to entering into an equitable release agreement. I know you would not have put Mr. Hiller to the expense of having a complicated release agreement drafted except on that basis.

''The purpose of this letter is to advise Pearl King Tanner, Joseph H. King and Charles H. King that Mr. Hiller does not

desire to waive or relinquish any rights he may have by virtue of the foregoing events.

"Mr. Hiller expects the Kings to live up to their agreement.

"Would you kindly lay this matter before the Kings at your earliest convenience and advise me of their decision so that Mr. Hiller may formulate his plans accordingly."

Mrs. West testified that she discussed the release plan submitted by Hiller with Charles King and with Huovinen, and that the plan was rejected because under it the security of the respondents would have been practically destroyed. She also testified that, after Huovinen had rejected the plan, she told Hiller, over the telephone, that the plan was worthless, and that Hiller had replied that "it was this plan or no other." Hiller denied that this conversation had taken place.

Mrs. West, upon inquiry made both before and after the Hiller plan had been rejected, ascertained that the city planning commission had never approved the road system constructed by Hiller nor any subdivision plan of Hiller's. It was stipulated that all plans submitted by appellants to the planning commission had been rejected. Mrs. West denied that she ever told Hiller that approval of a release plan was conditioned upon approval of a subdivision plan by the city and state agencies involved. To the contrary she told Hiller, according to her testimony, that the submitted release plan was unsound because the release of any one of the 29 parcels might cut off or impair the right of access to some of the retained parcels, thus impairing the security of the Kings.

On October 16, 1946, Mrs. West wrote to the State Real Estate Commission informing it that the Kings had sold the 50-acre tract to the Hillers subject to a deed of trust; that the Hillers had requested a release of portions of the tract as parcels were sold; that the property had been surveyed and roads installed; and that no plan for roads or for subdividing had been approved by the city commission. The letter closed with the following paragraph: "We would like to know whether Mr. Hiller has made application to subdivide this tract and if you have approved it. We would also like to know if it is a fact that he can subdivide without a permit providing he sells no more than five lots in any one year. His tentative map shows 29 lots."

Under date of October 30, 1946, Lewis, a deputy of the commission in the Oakland office, wrote to the Kings in part as follows:

"You state in your letter that Stanley Hiller purchased a

fifty acre tract from you on the Tunnel Road and that he is requesting release prices from you covering your deed of trust.

"We have written Mr. Hiller previously for his report but have failed to hear from him to date. We would appreciate your cooperation in this matter, and inform Mr. Hiller that until such time as he produces evidence to your office to the effect that he has or is about to file a report with this Division, you will not agree to a schedule of release prices for lots in this parcel."

On November 18, 1946, Mrs. West wrote to Huovinen, enclosing a copy of the Lewis letter, and stated in part:

"I also asked in that letter if he could sell five or less lots per year without a permit from the Real Estate Commission. Mr. Lewis failed to answer this last question, so I phoned him to discuss the matter. He replied that they could not subdivide any tract that had six or more lots, no matter how many or how few were sold in a year, until such time as he has filed and had approved by the Division, a report on the tract.

"Mr. Lewis said further that if we granted Mr. Hiller a schedule of release prices now it was possible we might be enjoined in a suit against him if he sold lots without the permission to do so."

Under date of November 19, 1946, Huovinen wrote to Brown, enclosing copies of the Lewis and the last-quoted letter from Mrs. West, and stated:

"In view of the request of Mr. Lewis, it is the present position of the three successors in interest of the C. H. King Estate Company that until such time as Mr. Hiller produces evidence to the effect that he has filed, or is about to file, a report with the Division of Real Estate, they will not agree to any specific schedule of release prices for lots in the Hiller property.

"As soon as a definite plan acceptable to the Division of Real Estate has been completed, then—of course, the successors in interest of the C. H. King Estate Company will be glad to comply with the commitments heretofore given relative to the working out of a schedule of release prices."

This correspondence all took place in 1946, but the negotiations between the parties did not cease in that year. In February of 1947 Brown discussed with Huovinen a possible plan of dividing the 50-acre tract into four parcels and fixing a

release price for each parcel. These discussions were caused by the fact that a Mr. Pedemonte was interested in buying one such parcel. However, no specific release plan was ever submitted in reference to this four-parcel suggestion. Brown also talked to Huovinen, very generally, about the possibility of a release plan based upon a release price for each individual acre. However, no specific plan was ever suggested in these discussions; in fact, the only release plan ever submitted by Hiller was the original 29-parcel plan. The Kings did not submit any release plan. Brown admitted that in the discussions with Huovinen about the four-parcel and single-acre plans Huovinen did not break off discussions, but testified that they never seemed able to agree.

In the early fall of 1948 Hiller conceived the idea of constructing a group of cooperative apartments on the property. He discussed the plan with one of his attorneys and had a plan drafted. Shortly thereafter, under date of October 25, 1948, he wrote to Huovinen as follows:

"I have not given up hope of subdividing and marketing the property which I purchased from the King Estate and believe that with an improved market for building lots we could come to a final agreement on the release of lots sold from the deed of trust on the plan previously discussed with you by my attorney, Mr. Brown. If you can advise me whether the Kings are now willing to proceed with the making of a release agreement as originally intended, I shall refer the matter again to Mr. Brown to conclude the matter on my behalf. However, I do not wish to incur unnecessary expense if your clients have reached a final decision not to enter into any release arrangement.

"Please advise me what I may expect in this connection as I wish to avoid further expense in building roads, etc., if it is necessary for me to refinance or otherwise dispose of the property.

"I would appreciate your early reply giving me your clients' final word in the matter."

This letter elicited the following reply from Huovinen dated October 28, 1948:

"I have been advised by my clients that they would not consider the matter of releases on the property purchased by you until you have presented a subdivision plan which has been approved by both the City of Oakland and the State of California.

"My attention has been called to the fact that apparently you previously totally ignored the advice or rulings of both

in the matter of construction of roads. This is one of the reasons that the interested parties do not wish to entangle themselves in a plan which would in any way weaken their security.

"In light of the foregoing may I suggest that if you desire to take up the matter of a release plan you first get full approval of a subdivision plan as indicated."

This letter provoked a letter dated November 5, 1948, from the Hillers to the Kings giving the Kings notice of intention to rescind. The notice states that the Kings have now improperly added the condition to the contract that before a release plan will be approved by the Kings the Hillers must secure approval of a subdivision plan, and that such was not contemplated by the parties when the contract was entered into.

Dated November 18, 1948, Huovinen replied to this letter, refusing to accept the proffered rescission, and denying that the Kings had violated, in any way, the terms of the existing contract. He also included a notice of default, because the Hillers were then three months behind in their required payments.

There is some other evidence to which reference should be made. Brown testified that the State Department of Real Estate requires that before a piece of land can be sold from a larger piece covered by a deed of trust there had to be a plan whereby the purchaser of the parcel could get his parcel free and clear of the underlying deed of trust when he paid the purchase price of his parcel. If a large area is to be cut up into more than five parcels, the seller must answer a questionnaire giving certain required information to the state, and must attach a copy of the release plan. Admittedly, such a questionnaire was never filed by the Hillers, for the reason, according to Brown, that a release plan had never been agreed upon. Brown and Hiller admitted that the roads constructed by the Hillers on the tract had been constructed without prior or any approval of the city planning commission. Hiller knew at all times here relevant that state and city approval were conditions precedent to any subdivision plan.

There was expert testimony to the effect that the road work done by the Hillers adversely affected the value of the entire tract, but the roads could have been widened and the turning areas enlarged. Four witnesses testified that they were ready,

able and willing to purchase lots from Hiller, had Hiller been able to sell.

On this evidence, so far as pertinent here, the trial court made four basic findings:

1. That on September 18, 1946, the Hillers submitted to the Kings a written release plan, to which the Kings refused to agree; that such refusal was not unreasonable; that this was the *only* release plan submitted;

2. That no basis for the releases was ever mutually agreed upon;

3. That the Kings never refused to enter into a reasonable release agreement in accordance with the basic contract; and

4. That the Kings have, at all times, been ready and willing to perform all obligations under the agreement.

Judgment was entered in favor of the Kings, and the Hillers appeal.

In their answer to the appellants' complaint the respondents had averred that the release agreement contained in clause 5 of the contract of sale was merely an agreement to agree in the future and, therefore, unenforceable. This allegation, say the appellants, demonstrates that respondents repudiated clause 5 and had no intention of complying with it. The trial court made no finding as to the legal effect of clause 5.

■ Not as a question of fact but as a matter of law, there is grave doubt as to whether clause 5 imposes an enforceable obligation on respondents. The parties entered into a complete contract of purchase and sale. Then, by clause 5 they provided that if appellants wanted to resell, "from time to time" the parties would agree upon a release price to be then "mutually agreed upon by the parties." This would appear to be no more than a provision that if the contingency arose the parties would get together and try to agree upon a release plan that would be acceptable to both parties. Certainly the Kings did not agree to approve any release plan that might be submitted. It would appear that the clause contains *nothing more than an agreement to try to agree* upon a release plan sometime in the future if the Hillers decided to subdivide. There is grave doubt as to whether such an agreement is enforceable. In *Autry* v. *Republic Productions, Inc.*, 30 Cal.2d 144 [180 P.2d 888], there was a paragraph of an employment contract that provided that, in the event Autry should enter the military service, the parties "will agree upon their mutual rights and obligations hereunder in view of such military service." (P. 151.) In commenting on this para-

graph the court stated: "There is no dispute that neither law nor equity provides a remedy for breach of an agreement to agree in the future. Such a contract cannot be made the basis of a cause of action. [Citing three California cases.] The court may not imply what the parties will agree upon. [Citing one California case.]" The rule was stated as follows in *Dillingham* v. *Dahlgren*, 52 Cal.App. 322, 330 [198 P. 832]: "An agreement that parties will, in the future, make such contract as they may then agree upon amounts to nothing. An agreement to enter into negotiations and agree upon the terms of a contract, if they can, cannot be made the basis of a cause of action. Where a final contract fails to express some matter, as, for instance, a time of payment, the law may imply the intention of the parties; but where a preliminary contract leaves certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon." (See, also, *Kerr Glass Mfg. Corp.* v. *Elizabeth Arden Corp.*, 61 Cal.App.2d 55 [141 P.2d 938].)

However, even if clause 5 did impose an obligation upon the Kings to approve a reasonable release plan, the finding that the Kings' refusal to approve the plan submitted was not unreasonable is fully supported by the evidence.

The appellants argue that respondents simply arbitrarily refused to enter into any overall release plan; that their final refusal attempted to add a new condition to any release plan, namely, approval of a subdivision plan by the city and state authorities; that such refusal resulted in a partial failure of consideration, which entitled them to rescind (Civ. Code, § 1689.2; see cases collected 6 Cal.Jur. p. 391, § 235); that the release plan submitted by Brown to Huovinen was not a subdivision plan at all, and did not require city or state approval; that it was simply a chart setting up values for the release of the designated parcels when and if any such parcel was sold; that this plan would be usable whether the 50-acre tract was sold in several parcels or many, up to 29 parcels; that the plan was fair and reasonable because it provided release prices that amounted to 140 per cent of the balance owed the Kings; that Huovinen had approved the submitted proposal; that after Huovinen had submitted the plan to the Kings, by his letter of October 2, 1946, the refusal to approve was not based on any contention that the submitted plan was unreasonable, but constituted an outright refusal to "enter into a releasing Agreement at this time," and demanded that

Hiller, if he wanted to sell the tract in parcels, "refinance his note"; that this was an outright refusal to perform a promise that was the primary inducement to appellants to enter into the contract; that this resulted in a material failure of consideration justifying a rescission; that although clause 5 sets no time for performance, a reasonable time is implied under section 1657 of the Civil Code.

Most of these arguments are based on appellants' interpretation of the facts, and completely disregard the conflicting evidence and the reasonable inferences therefrom. Undoubtedly there is evidence, and inferences from the evidence, to support findings that clause 5 was a substantial and material covenant, and that respondents' refusal to approve the submitted plan was unreasonable. But the difficulty with all of appellants' arguments is that the trial court found that respondents' refusal to approve the submitted plan was not unreasonable, and there is evidence to support that finding.

Before directly discussing this point, however, there are certain portions of appellants' argument that should be first mentioned. Although Huovinen stated that, in his opinion, the submitted plan was satisfactory, it was not within his power to make the final decision, and his letter expressing his personal approval stated that the proposal would be submitted to the Kings. ■ It is true that Huovinen's letter of October 2, 1946, definitely stated that the Kings "did not wish to enter into a releasing Agreement at this time," and indicated that Hiller would have to refinance his note if he wanted to subdivide. That looks, on its face, as if respondents absolutely refused to enter into any release agreement, reasonable or otherwise. If suit had been brought shortly after October 2, 1946 (assuming that clause 5 contains an enforceable covenant), there would be much force in the argument that respondents had violated the clause, had refused to enter into any release agreement, and that there was a failure of consideration. But the parties did not interpret nor treat the letter of October 2, 1946, as an outright refusal. For two years, thereafter, they continued to negotiate and to attempt to arrive at an agreement on a reasonable plan. For these reasons the letter of October 2, 1946, cannot be construed as an absolute refusal to enter into a reasonable release plan because the parties did not so interpret it. Moreover, there is the testimony of Mrs. West that she conveyed to Hiller the information that the Kings believed the plan to be unreasonable, and gave the reasons for such belief, but was told by Hiller

that respondents had to approve the submitted plan and no other.

It should be also pointed out that the only plan ever tendered by appellants was the one contained in the letter of September 18, 1946. In more than over two years of subsequent negotiations no other plan was submitted by appellants. Certainly, appellants cannot complain that respondents failed to make a counterproposal. Not only did clause 5 not impose any such obligation upon respondents, but the very nature of the clause makes it clear that the burden of working out the details of a release plan was imposed on appellants, for whose benefit the clause had been inserted. Moreover, respondents were never requested to submit a counterproposal. It must be remembered that, before the agreement of purchase and sale had been entered into, Mrs. West did suggest that the contract should contain a definite release plan, but Hiller objected and refused to tie himself down to one plan.

On the key question as to whether the finding that respondents' refusal to enter into the release plan of September 18, 1946, was not unreasonable, the evidence is clearly in conflict. In the first place, it is very doubtful if respondents ever obligated themselves to approve a single all-inclusive release plan covering the entire tract. Clause 5 refers to releases "from time to time" of "any portion or portions of the property." A reasonable interpretation of the agreement is that the parties intended that if Hiller decided to sell a portion of the 50-acre tract, the parties would agree upon a release price for that parcel, and not that respondents would agree in advance to an overall release plan. Thus, respondents, as appellants made their proposal for a specific parcel, could determine upon a release price for that parcel that would not adversely affect their security.

In the second place, the finding that respondents' refusal to approve the proposal of September 18, 1946, was not unreasonable, even if an overall release plan was contemplated, is supported by convincing evidence. Attached to the proposal was a map showing a system of roads which had not been approved by the city, which provided no means of ingress and egress from certain of the parcels, and which made possible selective selling that would have adversely affected the security of respondents. These roads were constructed before the release plan was submitted.

■ But, say appellants, Huovinen's letter of October 28, 1948, imposed a new and unwarranted condition, that is, that no release plan would be entered into unless a subdivision plan had been first approved by the city and state authorities. It is contended that under the law (Bus. & Prof. Code, §§ 11000, 11010 and 11013), approval of a subdivision plan could not be secured until the subdivider first secured a binding release plan. Therefore, say appellants, respondents actually attached a condition to further negotiations that they knew could not be fulfilled. Based on these premises, reliance is placed on those cases stating the well-settled rule that attaching an unwarranted condition to an offer of performance amounts to a refusal to perform. (*Steelduct Co.* v. *Henger-Seltzer Co.*, 26 Cal.2d 634 [160 P.2d 804]; *Loop Building Co.* v. *DeCoo*, 97 Cal.App. 354 [275 P. 881].)

We think it undoubtedly is the law that the release plan must be secured before a subdivision plan will be finally approved, and sales of separate parcels permitted. But that does not mean that by the letter of October 28, 1948, the respondents, under the facts, acted unreasonably in suggesting that city and state approval be secured before a release plan would be approved. The actual facts existing must be considered. Here, respondents had sold 50 acres of unimproved land to appellants and had accepted quite a small down payment. They had a material financial interest in protecting their security for the balance of the purchase price. The appellants had constructed roads on the property in violation of the law, in that approval of the city authorities had not been secured. There was positive evidence that the system of roads attached to the release plan of September 18, 1946, and the system of roads actually constructed by appellants, resulted in making the value of the entire tract less than it was before the roads were constructed. While it is true that the plan of September 18, 1946, was not a subdivision plan, but simply a schedule of release prices, in view of the fact that if respondents approved the release plan appellants could have then attempted to get approval of a subdivision plan based on the release plan, and in view of the fact that a road system aimed at carrying such a plan into effect had been constructed, it was not unreasonable for respondents to suggest that city and county approval be secured before a release plan would be approved. It would have been a meaningless gesture to have approved a release plan if the subdivision plan were unacceptable. Moreover,

respondents had been informed by the state real estate department that the department had requested a report from Hiller, but that he had not responded. The deputy requested respondents to cooperate with the department by informing Hiller that, until such time as he produced evidence that a report had been filed with the department, no release plan would be approved. The deputy also informed Mrs. West that if Hiller tried to sell lots without permission, respondents might be subject to an injunction suit. These facts were conveyed to Brown on November 19, 1946. Under the circumstances, the proposed condition was not unreasonable.

Some objection is made to the findings. Thus, it is urged that there is no express finding as to the reasonableness of the valuations set forth in the letter of September 18, 1946. But finding VII is to the effect that respondents' ''refusal was not an unreasonable refusal.'' That finding, by necessary implication, includes a finding that the proposal was not reasonable. The findings could have been more specific on this and on some other issues, but the court did find on the key issues, and that is all that is indispensable. As we read this record, Hiller has brought the difficulties under which he now labors on his own shoulders. He went ahead and constructed roads without proper approval, thus jeopardizing the security of respondents. That is what caused respondents to be suspicious and quite critical of any release plan. Hiller never did get out of the difficulties caused by his proceeding to construct the roads without government approval.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 23, 1951.