[Civ. No. 32494. Second Dist., Div. One. Dec. 23, 1968.]

WHITE POINT COMPANY et al., Plaintiffs and Respondents, v. PAUL B. HERRINGTON et al., Defendants and Appellants.

Dodge & Loveridge, Paul F. Loveridge, Oakley C. Frost and Donald R. Price for Defendants and Appellants.

Joseph J. Snyder, Walleck, Shane & Baechtold and David L. Shane for Plaintiffs and Respondents.

FOURT, J.—Paul B. Herrington and Marjorie M. Herrington, husband and wife and the owners of certain unimproved land in Moorpark, California, appeal from an order of the court, sitting without a jury, decreeing specific performance of an alleged agreement for the purchase and sale of a portion of the Herrington real property.

■ Appellants contend that certain provisions in the escrow instructions which constitute the alleged contract of sale contemplate future agreement by the parties, and that material terms as to release clauses and easement locations are so uncertain as to render the entire agreement unjust and unreasonable as to appellants and not specifically enforceable. We have concluded from our examination of the entire record that appellants' contention is well taken and that the trial court's decree of specific performance constituted an abuse of discretion in that it in effect created a new contract for the parties.

The Herringtons (hereinafter sometimes together referred to as Herrington) in 1963 owned several hundred acres of unimproved ranch land in Moorpark, California. Frank La Salle, owner of La Salle Music Corporation (hereinafter sometimes called La Salle Music), had on various occasions informally discussed with Paul Herrington the prospective sale of a portion of the acreage, and had in fact purchased 12½ acres thereof sometime prior to the present transaction. In December 1963, La Salle and Mrs. Mary E. Shaffer, owner of White Point Company (hereinafter sometimes called White Point), met and discussed with Paul Herrington their prospective joint purchase of three parcels of the Herrington property: the north 20 acres of Lot 21, the south 40 acres of Lot 22, and a 2.5-acre parcel in Lot 20 upon which was situated the old Herrington single family residence, a total of about 62.5 acres.

Herrington was interested in selling the acreage for a total price of $3,500 per acre, but he was concerned about a couple of matters with reference to the future use of the property: (1) the Herrington acreage was supplied with water from a single well situated in the southwest corner of Lot 22 which Shaffer and La Salle proposed to purchase, and Herrington was under compulsion to retain title to the well because he had granted to a corporate lessee the right to remove therefrom at its own expense all the water it might need for gravel pit operations on other Herrington land some distance from the well; (2) easements would be required to provide temporary protection of pipeline locations and maintenance rights for both the 2-inch pipeline from the well to the Herrington residence and a 5-inch pipeline from the well to the gravel pit, and to provide for prospective relocation of these lines over Lots 21 and 22 upon future development of the property. The prospective purchasers, on the other hand, were

principally concerned with the finances and engineering requirements for the potential commercial development of the property, either as a shopping center or a residential subdivision. Herrington testified, and it seems reasonable to suppose, that La Salle and Shaffer considered it desirable, if not essential, to open an escrow for the purchase before investing in engineering feasibility reports or instituting an application for rezoning.

Therefore, the parties, with numerous terms as yet unresolved between them, agreed that an escrow for the purchase and sale of the property should be opened at the Bank of A. Levy in Simi, California. Accordingly, on January 23, 1964, Paul Herrington met Shaffer and La Salle at the escrow department in the bank where they discussed the proposed transaction at length with the escrow officer. As of that date the parties had not yet agreed upon the precise amount of the down-payment or the trust deed obligation, the method of handling the well situation, the description of the pipeline and other easements, and the appropriate terms of clauses relating to financing and security in the event of future development. The escrow officer's suggestion that the parties consult a lawyer to resolve uncertainties was rejected as premature and the escrow officer thereafter, at the request of the parties, drafted escrow instructions naming the Herringtons as sellers and La Salle Music and White Point as joint purchasers with the right to use other names in the ultimate vesting of title.

The escrow officer's original proposed instructions provided for a $38,750 down-payment with the unpaid balance of $180,000 to be evidenced by a promissory note with interest at 6 percent per annum, principal payments to be amortized by equal $12,000 annual installments over the 15-year term of the note and interest payable in semiannual installments. The promissory note was to be secured by the 60 acres of property located in Lots 21 and 22 while the purchasers were to receive free and clear, in consideration of their down-payment, the deed to the 2.5-acre parcel in Lot 20 on which the single family residence was situated. The instructions additionally gave the buyer the right to a 30-day extension for closing, provided for partial releases at $3,000 per acre,[1] gave buyers an easement over the wellsite,[2] and allowed for the realign-

[1] "This note to have Release Clause attached providing for partial releases at $3,000.00 per acre."

[2] "Buyer herein to receive easement over SW corner of Lot 22 now occupied as well site with the right to use of surface of said land as long

ment of pipelines.[3] These instructions were not fully acceptable and on January 29, 1964, the parties once more met at the escrow department. At the buyer's request a provision was added purporting to allow the buyer to sell parcels of five or more acres during escrow which might be covered by separate trust deeds.[4] Both the original instructions and the amendment thereto were then executed by the Herringtons, by Mrs. Shaffer on behalf of White Point and by La Salle on behalf of La Salle Music.

The Herringtons promptly obtained and deposited in escrow a legal description of the parcels, including the 2.5-acre parcel surrounding the old family residence and the well-site surface area of approximately .48 acres which were surveyed for that purpose. The buyers were required by the escrow instructions to "deposit in escrow written approval of the C, C & R's of record and the Engineering Report being obtained by buyer." They subsequently decided, however, to avoid the expense of obtaining an engineering report because the originally contemplated commercial development was deemed premature. Accordingly, White Point and La Salle Music deposited in escrow their written approval of the preliminary title report and their approval and waiver of engineering reports. Although respondents also deposited in escrow a proposed form of release clause, that document was neither transmitted to nor approved by appellants. It appearing to Herrington that certain matters remained to be satisfactorily resolved, signed deeds to the property were not deposited in escrow. White Point and La Salle Music as the named purchasers thereupon instituted the within action seeking specific performance.

At the opening of the trial the parties orally stipulated by counsel in open court that respondents' cause of action for damages and appellants' cross-complaint for fraud were dismissed, and that the consideration in terms of money agreed upon as the purchase price of the property was fair and adequate as of the date upon which the escrow instructions were

---

as well is not disturbed. Legal description of site to be supplied by seller.''

[3]"It is agreed between buyer and seller that existing pipe lines may be realigned for the purpose of future development of subject property with the seller's pipe lines being re-located with buyers lines.''

[4]"Buyer reserves the right during the life of this escrow that any parcels of 5 or more acres can be covered by a separate trust deed and deed vested in another name or names. Terms of note to be same as original. Name or names and vesting to be deposited in escrow by buyer.''

executed. Following the presentation of evidence, the court took the matter under submission and on April 3, 1967, filed its Memorandum of Opinion expressing its intention to rule in favor of respondents. By minute order of the same date, the court directed counsel for respondents to prepare findings of fact, conclusions of law, and the judgment which the court directed ''shall contain the direction to the plaintiff to arrange for all cash payment to the defendants or in lieu thereof, to the parties to negotiate on the details for the release clause with provision to seek the aid of the court if that becomes necessary.''

The Memorandum of Opinion[5] reviews the provisions of the escrow instructions in the light of the evidence and the law. Although the court was impressed that the ambiguity of the provision for release clauses cast doubt upon the validity and enforceability of the contract and made it unfair, the court sought to incorporate therein an implied-in-law covenant of good faith requiring the parties ''to sincerely and earnestly negotiate to complete adequate details so as to make the contract fair and reasonable.'' The court further declared ''. . . I feel that the matter of formulating release details beyond the expressed fundamentals, in order to insure fairness, lends itself adequately to the supervisory capacity of the court. Of course the plaintiffs can obviate all such problems by securing outside financing and paying the defendants all cash through the escrow.''

On June 2, 1967, plaintiffs noticed a motion for an order of the court ''determining certain items left unresolved in the Court's Memorandum of Judgment dated April 3, 1967, and more particularly for an Order resolving and determining the language, terms and conditions of the notes, trust deeds, easements and release clauses to be incorporated in the Judgment to be rendered in favor of plaintiffs in the above action.'' Counsel's supporting declaration states that ''Counsel for plaintiffs are unable to consummate the purchase of the property in cash, a possibility suggested by the Memorandum of April 3, 1967'' and since the parties remain unable to agree it will be necessary for the court to resolve certain essential issues. The matter was heard on June 12, 1967, and although the court indicated that it considered the motion premature, it

---

[5]We refer to the trial court's 20-page memorandum to explain the reasoning by which it arrived at a resolution of the issues, (*Mears* v. *Mears*, 180 Cal.App.2d 484, 504 [4 Cal.Rptr. 618]; *Union Sugar Co.* v. *Hollister Estate Co.*, 3 Cal.2d 740, 750-751 [47 P.2d 273]) not to impeach the judgment.

nonetheless directed counsel for plaintiffs to prepare findings and to propose in writing the necessary details for implementing specific performance of the contract.

Accordingly, plaintiffs on July 20, 1967, filed with the court two documents: (1) "Plaintiffs' Proposed Details of Judgment" sets forth the release clause proposed by respondents to protect appellants' security interest, the suggested terms relating to temporary and permanent pipeline easements, the names of the proposed vestees, and plaintiffs' willingness that the court shall determine any remaining details, and; (2) In "Plaintiffs' Waiver of Provisions of Contract of Sale" it is declared, inter alia "Plaintiffs waive these provisions concerning releases and agree to accept either that release clause proposed by plaintiffs or such other release clause as may be ordered by the Court." The judgment incorporates the release clause proposed by respondents, purports to create a permanent easement for pipelines along the Westerly 6 feet of Lot 22, and provides for temporary pipeline easements in place "until there is a necessity for realignment of pipelines for future development of said property at which time said pipelines may be relocated with such pipelines that may then be installed by the then owners of said real property." Defendants have appealed from the judgment decreeing "That the agreement set forth in the complaint herein, and proved in this cause; be specifically performed excepting as herein modified, . . ."

It is well established that: ▮▮ "An agreement cannot be specifically enforced unless the terms are 'sufficiently certain to make the precise act which is to be done clearly ascertainable.' (Civ. Code, § 3390, subd. 5.) It must not only contain all the material terms but also express each in a reasonably definite manner. [Citations.]" (*Spellman* v. *Dixon*, 256 Cal. App.2d 1, 3 [63 Cal.Rptr. 668].) The trial court in the instant case was clearly and with reason concerned about the ambiguity of the release clause provision in the escrow instructions which constitute the only concrete embodiment of the purported contract. ▮▮ If this provision constitutes a material term of the contract, rather than merely a term requiring good faith elaboration of detail, its patent uncertainty voids the entire agreement. The legal principles requiring that material terms be set forth in a reasonably definite manner "have been applied in denying specific performance of agreements which are incomplete, indefinite or uncertain with respect to the terms of payment of deferred balances or the

terms of encumbrances representing such deferred balances. [Citations.]'' (*Magna Development Co.* v. *Reed,* 228 Cal. App.2d 230, 236 [39 Cal.Rptr. 284].) In recent years subordination agreements have frequently been reviewed by appellate courts with respect to the issues of uncertainty, materiality and fairness. Where the subordination provisions have been found uncertain and incapable of ascertainment by reference to an objective standard, the contracts have been deemed void for the uncertainty of a material provision (*Stockwell* v. *Lindeman,* 229 Cal.App.2d 750 [40 Cal.Rptr. 555]; *Spellman* v. *Dixon, supra,* 256 Cal.App.2d 1; *Handy* v. *Gordon,* 65 Cal.2d 578 [55 Cal.Rptr. 769, 422 P.2d 329].) The courts have observed that a contrary holding would force the seller to rely upon the buyer's good faith in carrying out the purposes of the agreement so as not to impair the seller's security, and this result would be unfair to the seller.

Those infrequent decisions which have enforced incomplete subordination agreements have reasoned that the contract provision is not uncertain if the parties provide the minimum essential restrictions upon loan amounts and interest, further providing that they will agree to details supplied by a lending institution. ''Other details the parties may contract to leave to the institutional lenders [see *Burrow* v. *Timmsen,* 223 Cal. App.2d 283 [35 Cal.Rptr. 668, 100 A.L.R.2d 544]] or to usage and custom in the area for such loans, or to the negotiation of the buyers and the lender as was done here. However, *if such details are left to the future agreement of buyer and seller, then the contract is uncertain and unenforceable.''* (*Stockwell* v. *Lindeman,* 229 Cal.App.2d 750, 758 [40 Cal.Rptr. 555].) (Italics added.)

Although release clauses have less commonly been referred to judicial determination, it has clearly been established that such clauses constitute material provisions of the contract for reasons similar to those relating to subordination agreements. (See *Magna Development Co.* v. *Reed, supra,* 228 Cal.App.2d 230; *Hiller* v. *King,* 105 Cal.App.2d 181 [232 P.2d 905].)

''The partial release clause for inclusion first in the land sale agreement and finally in the purchase-price security instrument is often a matter of serious bargaining between the parties. The 'release plan' is a necessary element of the preliminary contract and is affected by considerations of certainty and specific performance not unlike those concerning subordination clauses.'' (California Land Security and Development (Cont. Ed. Bar, 1960) p. 143.)

Release clauses assume special significance under particular circumstances, as where differences in terrain or roadway access render one acre no simple value substitute for another. The trial court in the present case, indeed, reviewed and emphasized the existence of circumstances creating potential value disparity and unfairness. "The documentary evidence and some of the testimonial evidence indicates that the property involved is traversed by washes, gullies and ravines and that therefore certain portions thereof would be much more choice than others, some parts being actually undesirable unless grading work were performed etc. As argued by the defendants, if the release clause finally included in the promissory note were to contain only the broad guides included in the language of the escrow instructions, partial releases at $3,000 per acre, the plaintiffs could select the choice sections for release and leave the defendants' security including only the undesirable parts having only a small value in comparison with the balance due on the note. Also such factors as isolating sections remaining as a security from access to roadways and making them noncontiguous among themselves etc. would create hardship for the defendants. Moreover as the contract was worked out the cash payment made by the defendants was allocated to the 2½ acres containing the residence which Mrs. Shaffer indicated she was going to take as her own residence which, in effect, would mean that the whole portion of the property being purchased which would be held for or devoted to subdivision or resale would have had no down payment applicable to it. This may not be too significant because of the fact that a higher price per acre was allocated to the residence site as a tax advantage to the sellers so that in actuality the down payment must be considered as partially applying against the other majority parcels. The two factors just analyzed appear to be interconnected. If only the broad outlines are to govern the operation of the release aspect, the contract is unfair. Because it is a feature where such unfairness can drasticly [sic] effect [sic] the interests of the seller, it is an area wherein the court should require greater specificity."

While recognizing the uncertainty and prospective unfairness of the release clause provision, the trial court failed to acknowledge that this provision constituted a material and substantial term of the alleged agreement. As a result, the court attempted to substitute for the parties' incapacity to agree, judicial standards of fairness. ■ Where, however,

the written contract of the parties is ambiguous, and parol evidence of the transaction between the parties fails to remove the ambiguity as to a material term of the agreement, specific performance must be refused.

■ "The rule . . . is that when something is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. 'Since either party, by the very terms of the promise, may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise.' [Citations.]" (*Magna Development Co.* v. *Reed, supra,* 228 Cal.App.2d 230, 238.) ■ There appearing no external standards nor any reference to custom and usage by which the parties in the present case agreed to be bound, and insufficient parol evidence of what the release clause was intended to contain, there was no sound legal basis upon which to supply the missing terms. The court's attempt to decree in the alternative that respondents pay cash for the property, or the parties negotiate in good faith acceptable terms for the release clause failed and the court was ultimately forced to its third alternative whereby the court supervised the drafting of the release clause. The court in this role in fact constructed, on the basis of judicial notice taken of legal custom and usage, a new agreement between the parties. ■ "[I]t is a well-established principle that although custom is admissible for the purpose of interpreting the contract or agreement of the parties, or for furnishing details not expressly covered thereby, it is not admissible to *establish* a contract. [Citations.]" (*Magna Development Co.* v. *Reed, supra,* p. 240.) ■ Only the valid and binding agreement of the parties, including all material terms well-defined and clearly expressed, may be ordered specifically performed.

■ Finally, respondents in their appellate brief declare: "In the present case, Respondents have not considered the release provisions to be material to the contract; otherwise, they would not have agreed to waive the provisions contained in the agreement and to accept any release clauses that might be ordered by the court. Furthermore, Respondents will at this time waive completely the release provisions in the agreement, if the court should deem this a proper condition to the granting of specific performance."

"Assuming . . . that appellants could waive the . . . [release clauses] there must be a clear and valid waiver. ■ To be valid a waiver must be a clear expression made with a full

knowledge of the facts and an intent to waive the right. [Citations.]'' (*Spellman* v. *Dixon, supra,* 256 Cal.App.2d 1, 4.) ▆▆▆ The earliest time at which respondents evidenced any intention to waive the release provisions was on June 20, 1967, after the court's minute order and Memorandum of Opinion expressing its intention to rule in respondents' favor. The document labelled ''waiver'' was conditional since it merely expressed respondents' intention to accept an alternative release provision which respondents or the court might draft and constituted in either event a radical alteration of a written contract. ''[I]f a party were permitted to waive defective provisions going to the essence of a contract, the court, in effect, would be allowing the unilateral creation of a new, different contract. ▆▆▆ A party to a contract cannot erase uncertainty therefrom by waiving such uncertainty and thereby restore its contractual validity. [Citations.]'' (*Magna Development Co.* v. *Reed, supra,* 228 Cal.App.2d 230, 242-243.) ▆▆▆ Respondents' current offer to waive absolutely the release clause provision must be regarded as a nullity.

The judgment is reversed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied January 20, 1969, and respondents' petition for a hearing by the Supreme Court was denied February 19, 1969.