[Civ. No. 22463. Fourth Dist., Div. One. Jan. 25, 1980.]

NORMAN KRASLEY, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
JAMES P. BRENNAN, Real Party in Interest.

426

COUNSEL

Goldin, Haviland & Leuthold and Richard R. Leuthold for Petitioner.

No appearance for Respondent.

Donald A. Nunn for Real Party in Interest.

OPINION

**BROWN (Gerald), P. J.**—Norman Krasley petitions for a writ of mandate to compel the trial court to vacate its order denying his motion for summary judgment and instead to enter summary judgment in his favor. The underlying action was brought by real party in interest James Brennan for specific performance or damages under an alleged contract between himself as buyer and Krasley and his deceased wife Beulah, as sellers, of real estate in Chula Vista. As a matter of law the affidavits show no enforceable contract for the sale of real estate. Summary judgment in Norman's favor should have been entered. ■ A writ of mandate is an appropriate method to require the trial court to do so

*(Roman Catholic Archbishop* v. *Superior Court* (1971) 15 Cal.App.3d 405, 410 [93 Cal.Rptr. 338]; *Burke Concrete Accessories, Inc.* v. *Superior Court* (1970) 8 Cal.App.3d 773 [87 Cal.Rptr. 619]).

The facts established by the parties' affidavits and depositions lodged with the court and the documents offered as exhibits below are: Brennan, a real estate broker, sued for specific performance, or alternatively for damages, based on an alleged contract by which the Krasleys, in December of 1977, when both were in their 80's and ill with pneumonia, supposedly agreed to sell to Brennan a one-acre lot with house and antique business, located at 330 Moss Street in Chula Vista, owned by the Krasleys in joint tenancy since about 1942. On December 1, 1977, they listed the property for sale with their broker, Gruss, hoping to get about $165,000. A number of offers were received, including that of real party Brennan, and between December 16 and December 30, 1977, negotiations continued between the Krasleys and Brennan with offers and counteroffers being carried back and forth by the brokers representing each party. Documents from the Krasleys were sometimes signed only by Norman and sometimes by both Norman and Beulah. Finally on December 27, 1977, Brennan submitted to the Krasleys an offer which he now contends was accepted. That offer is written on a standard real estate broker's form entitled "Real Estate Purchase Contract and Deposit Receipt." Pertinent language added to the customary boiler plate was: "1. . . . Seller to subordinate to a Construction Loan. . . .

"9. Buyer's signature hereon constitutes an offer to Seller to purchase the real estate described above. Unless acceptance hereof is signed by Seller and the signed copy delivered to Buyer, either in person or by mail to the address shown below within two (2) days hereof, this offer shall be deemed revoked and the deposit shall be returned to Buyer.

"10. Time is of the essence of this contract." Thus, the offer provided for subordination to a construction loan, without specifying any of the terms; the offer expired by its own terms on December 29; and time was of the essence.

Next, on December 30, 1977, one day after the offer lapsed, Norman alone signed and delivered to Brennan's broker, at about 2:30 p.m., a document entitled "Counter Counter Offer" (CCO). The CCO is also on a boiler plate form and contains this pertinent language: "This is a

counter offer to the Real Estate Purchase Contract...dated December 27, 1977.

"The undersigned accepts the offer on the terms and conditions set forth in the above designated agreement with the following changes or amendments:

"The terms and price are acceptable if there is included in the deed of trust an acceleration clause.

"OPTION COUNTER OFFER Sale Price $155,000 with $44,950 cash, etc....

"Seller reserves the right to accept any other offer prior to actual receipt of buyer's acceptance." ■ Brennan contends this CCO is an acceptance of his (lapsed) December 27 offer such as to create a binding and enforceable contract compelling the Krasleys to sell him the property. The CCO contained two alternatives: either to agree to the previous terms of the December 27 offer plus addition of the acceleration clause requirement, or alternatively to enter into a new deal with different terms described under the heading "Option Counter Offer." Brennan contends at about 3:45 p.m. on December 30 he made his choice by striking out the second alternative, thus accepting the first alternative consisting of the terms of the December 27 offer plus an acceleration clause provision. He further claims his uncommunicated acceptance at that time bound the Krasleys, despite the express reservation in the CCO stating seller reserves the right to accept other offers before actual receipt of buyer's acceptance. Brennan does not declare the Krasleys or their broker ever received notice of his "acceptance," if such it was, before they received, and accepted, another offer by American Homebuilders that same afternoon. When at 5:10 p.m. on December 30, Krasleys' broker telephoned Brennan's broker, Whitegate Realty, and told them of the acceptance of the other offer, Whitegate took the position the Krasleys were bound to sell to Brennan because of his acceptance at 3:30 or thereabouts of the CCO. This lawsuit followed, and the property has been tied up ever since.

It is not important whether Beulah signed the CCO. Whether the contract, if any, were enforceable against her hardly matters since it would be enforceable against Norman to the extent of his interest in the property regardless of her rights, and since the records do not show

Beulah's interest has passed to anyone other than Norman, her joint tenant. If this issue were important, summary judgment would probably not be suitable because the factual issue would arise of whether she should be estopped to deny ratification or consent. (See, e.g., *Quan Shew Yung* v. *Woods* (1963) 218 Cal.App.2d 506, 511-512 [32 Cal. Rptr. 454].) The real issue is whether any enforceable contract exists at all. None exists.

Time is of the essence and the lapse provisions of the December 27 offer were for the benefit of Brennan and hence could be waived by him. Nevertheless, credulity is strained to treat a document entitled "Counter Counter Offer," which begins by reciting "This is a counter offer," as an acceptance of anything. It is argued factual issues exist whether the new term requiring an acceleration clause, so varied the terms of the December 27 offer as to constitute a new offer rather than an acceptance. That approach is hypertechnical and misses the point. Contract law being a question of objective manifestation of intent, the courts should treat a document as what it says it is unless extrinsic evidence supplies notice of ambiguities (*Ajax Holding Co.* v. *Heinsbergen* (1944) 64 Cal.App.2d 665, 670-671 [149 P.2d 189]). No trade custom or usage evidence is contained in any declaration nor has any been suggested which would tend to show this counteroffer is an acceptance of anything. It is therefore irrelevant whether adding an acceleration clause requirement to the terms of the December 27 offer materially varied its terms. The CCO was a new offer.

██ Further, as a matter of law, the original offer is not sufficiently specific to enforce because it contains a subordination clause requirement but does not specify the terms of the subordination. *Handy* v. *Gordon* (1967) 65 Cal.2d 578 [55 Cal.Rptr. 769, 422 P.2d 329, 26 A.L.R.3d 848], states such a contract cannot be specifically enforced because it does not establish the risk to the seller's security. The Supreme Court said at page 581: "Although the parties to a contract of sale containing a subordination clause may delegate to the vendee or third party lenders power to determine the details of subordinating loans, an enforceable subordination clause must contain terms that will define and minimize the risk that the subordinating liens will impair or destroy the seller's security. [Citations.] Such terms may include limits on the use to which the proceeds may be put to insure that their use will improve the value of the land, maximum amounts so that the loans will not exceed the contemplated value of the improvements they finance,

requirements that the loans do not exceed some specified percentage of the construction cost or value of the property as improved, specified amounts per square foot of construction, or other limits designed to protect the security. Without some such terms, however, the seller is forced to rely entirely on the buyer's good faith and ability as a developer to insure that he will not lose both his land and the purchase price." The lack of specification of the subordination terms makes the contract unenforceable whether specific performance or damages are sought. (See *Spellman* v. *Dixon* (1967) 256 Cal.App.2d 1 [63 Cal.Rptr. 668]; and discussion in *Eldridge* v. *Burns* (1978) 76 Cal.App.3d 396, 420 [142 Cal.Rptr. 845].) The law regarding subordination clauses is but a specific application of the general principle where a party seeks specific performance of a contract for the sale of real property, the terms of the contract must be complete and certain in all particulars essential to its enforcement and must express each material term in a reasonably definite manner (*Magna Development Co.* v. *Reed* (1964) 228 Cal.App.2d 230, 236 [39 Cal.Rptr. 284]; *Bruggeman* v. *Sokol* (1954) 122 Cal. App.2d 876, 881 [265 P.2d 575]). Although usage or custom may be used to explain the meaning of language or to imply terms (Civ. Code, § 1655; *King* v. *Stanley* (1948) 32 Cal.2d 584, 589 [197 P.2d 321]), no material element must be left to future agreement (*White Point Co.* v. *Herrington* (1968) 268 Cal.App.2d 458, 468 [73 Cal.Rptr. 885]). Here nothing offered by Brennan in opposition to the summary judgment motion supplies the missing terms, other than his general assertion trade custom and usage will fill the gaps.

Looking realistically at this case, Beulah is now dead and Norman is elderly. Their depositions reveal they remember little or nothing of the negotiations back in December 1977, when both were ill and Beulah was bedridden. Neither had experience in real estate transactions and both relied heavily on their broker. Neither had any notion what an acceleration clause or a subordination clause was all about. Assuming the new offer had not materialized, and the Krasleys and Brennan had continued to work out a deal, it is obvious they would have had to engage in further negotiations particularly dealing with the financing of the sale before an enforceable agreement existed. This is not a case where minor technicalities, such as the choice of a financing institution or escrow agent, remained for completion. Rather, the critical question of financing was still unresolved. The essence of a contract is the meeting of minds on the essential features of the agreement (*Lawrence Block Co.* v. *Palston* (1954) 123 Cal.App.2d 300, 308 [266 P.2d 856]). One

such essential feature is the terms and amount of the loan to which the seller's trust deed will be subordinated (*Handy* v. *Gordon, supra*, 65 Cal.2d 578) and here those terms are entirely missing.

■ Summary judgment is a drastic remedy (*Pettis* v. *General Tel. Co.* (1967) 66 Cal.2d 503, 505 [58 Cal.Rptr. 316, 426 P.2d 884]; *Eagle Oil & Ref. Co.* v. *Prentice* (1942) 19 Cal.2d 553 [122 P.2d 264]). All doubts are resolved against the moving party (*Keene* v. *Wiggins* (1977) 69 Cal.App.3d 308, 311 [138 Cal.Rptr. 3]). Nevertheless, its entry is mandatory in a proper case based upon the law and where the documents disclose no triable factual issues (*Whitney's at the Beach* v. *Superior Court* (1970) 3 Cal.App.3d 258, 266-267 [83 Cal.Rptr. 237]; *Roman Catholic Archbishop* v. *Superior Court, supra*, 15 Cal.App.3d 405, 410). We appreciate the reluctance of the trial court here to enter summary judgment, particularly because another judge of the same court had denied a motion for summary judgment in this case at an earlier stage of the litigation, before any discovery had taken place. Now that discovery has been completed, however, it is obvious there are no issues of fact whether an enforceable contract exists, and further delay is not warranted.

Although, in general, summary judgment is a remedy sparingly granted, we note a number of cases have found it proper and indeed required in situations involving actions for specific performance of alleged real estate contracts which were in fact illusory and consisted only of hastily scribbled offers and counteroffers which did not define with precision and clarity an agreement of sale. (See, e.g., *Ajax Holding Co.* v. *Heinsbergen, supra*, 64 Cal.App.2d 665; *Tibbs* v. *Smart & Final Iris Co.* (1957) 152 Cal.App.2d 618 [313 P.2d 636]; *Sinks* v. *Merrill* (1963) 222 Cal.App.2d 200 [35 Cal.Rptr. 113]; *Thomson* v. *Honer* (1960) 179 Cal.App.2d 197 [3 Cal.Rptr. 791]; see also *Caldwell* v. *Delaray Mines, Inc.* (1945) 68 Cal.App.2d 180, 184 [156 P.2d 52] [acceptance must be unequivocal and positive and must comply with terms of offer ].) The *Ajax Holding Co.* case, *supra*, was an action for specific performance of an alleged agreement for sale of an apartment hotel and lots. The only writing defendants signed was plaintiff's escrow instructions in which defendants inserted a supplement or counterproposal requiring them to approve certain letters plaintiff was to write, concerning such matters as inspection of the property, sale of the personal property, and plans for improvements. Affirming summary judgment for defendants, the appellate court noted, "The alleged con-

tract for the sale of realty turned out to be a myth." (*Ajax Holding Co. v. Heinsbergen, supra*, 64 Cal.App.2d 665, 670.) The court further pointed out if a counteroffer is clear and explicit and not absurd, its language must govern its interpretation (Civ. Code, § 1638) and the intent of the parties is gleaned from the writing itself (Civ. Code, § 1639) which is what it says it is. (*Id.* at pp. 670-671.) The following language from that opinion is apt here also: "...it cannot be said that we have a contract where a counterproposal to a written offer was never accepted by the original offeror." (*Id.* at p. 671.) In short, the CCO here is exactly what it says it is, a counteroffer, and it was not accepted by Brennan before the Krasleys accepted another offer, as they had the right to do by the terms in the CCO.

The parties have filed points and authorities. The remedy is clear. An alternative writ or order to show cause would add nothing to the full presentations already made. A peremptory writ is proper (Code Civ. Proc., § 1088; *Carruth* v. *Superior Court* (1978) 80 Cal.App.3d 215, 224 [145 Cal.Rptr. 344]; *Goodenough* v. *Superior Court* (1971) 18 Cal.App.3d 692, 697 [96 Cal.Rptr. 165]; *Bolles* v. *Superior Court* (1971) 15 Cal.App.3d 962 [93 Cal.Rptr. 719]; *McComb* v. *Superior Court* (1977) 68 Cal.App.3d 89, 93 [137 Cal.Rptr. 233]; 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, p. 3919) and should issue without further delay.

Let a writ of mandate issue directing respondent superior court to vacate its denial of summary judgment and enter summary judgment as prayed.

Cologne, J., and Staniforth, J., concurred.