Opinion
 

 ZEBROWSKI, J.
 

 The primary issue on this appeal involves an entertainment industry ADR (alternative dispute resolution) procedure gone seriously awry. The ADR procedure took place in two phases. After a preliminary injunction and related contempt proceeding, the parties stipulated to a voluntary mediation. The mediation yielded a one-page memorandum covering many material terms, but also providing that the parties would “formalize” additional material terms later. Anticipating possible dispute over these additional terms, the parties also agreed to “reserve jurisdiction” in the mediator “to resolve any dispute” over the “documentation” of their settlement and to “administer any process, including fact-finding, for a full implementation of the settlement.”
 

 When the parties attempted to “formalize” the additional terms, numerous disputes became apparent. Respondents then filed a “Motion to Specifically Enforce Settlement” pursuant to Code of Civil Procedure section 664.6 (section 664.6) This “motion” was filed not with the court, but rather with the mediator (hereafter private judge). The second ADR phase then followed pursuant to the clause quoted above. The exact nature of this second phase was disputed. Appellants regarded it as a continuation of mediation. Respondent and the private judge regarded it as a binding dispute resolution process authorized by section 664.6. No one contended that the further ADR proceedings were a form of arbitration, and no one has made that contention on appeal.
 

 The second ADR phase took place in several lengthy sessions. Most of these sessions were recorded by a court reporter, and transcripts are in the record. The transcripts clearly show lack of agreement on many material terms. Appellants—who regarded the process as a continuation of voluntary mediation—then declined to participate further. Respondent and the private judge, relying upon section 664.6 as authority, then continued the process in appellants’ absence. The private judge then signed a 33-page “Order Enforcing Settlement Agreement, etc. and Awarding Attorneys’
 
 *797
 
 Fees.” This “order” purported to impose upon appellants numerous material settlement terms to which appellants had never agreed.
 

 Respondent then moved in the superior court to enforce the “order” as a settlement agreement, again relying on section 664.6. The superior court granted the motion. By this method, a one-page memorandum which appellants signed after the initial mediation session became a thirty-five page judgment containing numerous material terms to which appellant had never agreed.
 

 Section 664.6 authorizes none of this. Neither a mediator nor a judge may select and impose settlement terms on the authority of section 664.6. Section 664.6 creates only a summary procedure for specifically enforcing certain types of settlement agreements by converting them into judgments. It provides that “the court, upon motion, may enter judgment pursuant to the terms of the settlement.” (§ 664.6, end of first sentence.) Before judgment can be entered, two key prerequisites must be satisfied, both of which were missing in this case. First, there must be contract formation. The litigants must first agree to the material terms of a settlement contract before a judgment can be entered “pursuant to the terms of the settlement.” If no meeting of the minds has occurred on the material terms of a contract, basic contract law provides that no contract formation has occurred. If no contract formation has occurred, there is no settlement agreement to enforce pursuant to section 664.6 or otherwise. Second, there must be a “writing signed by the parties” that contains the material terms. Here there was no writing signed by the parties containing the material terms, which the private judge placed into his order and which later appeared in the judgment. Section 664.6 therefore provided no basis for the judgment entered. Moreover, a section 664.6 motion must be made to “the court.” (§ 664.6, first sentence.) The “motion” made by respondent before the private judge did not constitute a “motion” to “the court” within the meaning of section 664.6, and hence adds nothing to the section 664.6 analysis.
 

 Appellants appeal from this judgment. In the published portion of this opinion, we reverse it. Appellants also appeal from the issuance of the preliminary injunction, and from the denial of a motion seeking to modify it. In the unpublished portion of this opinion, we affirm the issuance of the preliminary injunction and the denial of the motion to modify, but order an interim modification ourselves in view of the passage of time and possible changed circumstances, and remand with instructions for further proceedings.
 

 
 *798
 
 I. Factual and Procedural Background.
 

 a.
 
 The parties; the business breakup.
 

 Appellants are Stephen Flick, a corporation formed by Mr. Flick named Creative Cafe, and an employee of Creative Cafe (collectively the Flick Parties). Mr. Flick has long been in the business of editing sound effects for motion pictures, television, and related media. He has won Academy Awards for his sound effect editing on the movies Speed (20th Century Fox 1994) and Robocop (Orion Pictures Corp. 1987), and has been nominated for Academy Awards on three other occasions. In 1987, Mr. Flick joined with colleagues Mark Mangini and Richard Anderson to form respondent Weddington Productions, Inc., as a vehicle for conducting the business of sound effect editing. Each owned one-third of the stock of Weddington.
 

 In 1994, disputes arose, and in July of 1995, Mr. Flick left Weddington and formed Creative Cafe.
 

 b.
 
 The business of sound editing and Weddington’s sound library.
 

 The business of sound editing is performed by using a “library” of recorded sounds, such as guns firing, doors slamming, helicopters hovering, etc. These sounds are then mixed or modified as appropriate for a given production. Weddington had such a library. This library was jointly assembled by Messrs. Flick, Mangini and Anderson, as well as by employees of Weddington. While working as part of Weddington, Mr. Flick used this library. When Mr. Flick left Weddington and formed Creative Cafe, he took a copy of the library with him and continued to use it.
 

 c.
 
 The preliminary injunction proceedings.
 

 In December of 1995, Weddington obtained an injunction prohibiting the Flick Parties from using the library. In May of 1996, the superior court issued an order to show cause why the Flick Parties should not be held in contempt for violating the injunction by using the library to create sound effects for the movie Twister (Universal Pictures 1996). In June of 1996, evidence was presented at a contempt trial. Following the taking of evidence, but before the filing of closing briefs, the Flick Parties and Wedding-ton agreed to mediate. The contempt proceeding was then abated pending the outcome of mediation.
 
 [1]
 

 
 *799
 
 d.
 
 The mediation and the Deal Point Memorandum.
 

 The mediation took place in August of 1996. At the end of a 12-hour session, both sides signed a 1-page document commonly referred to as the “Deal Point Memorandum.” The Deal Point Memorandum began by reciting: “This Settlement Memorandum notes the significant ‘deal points’ with respect to all litigation now pending” between Weddington and the Flick Parties. It continued that “[a]ll parties agree to settle and dismiss on the following terms: . . .” The document then specified sums that Weddington would pay to the Flick Parties, a schedule for such payments, and the agreed allocation of these sums and other sums previously paid. The document also provided that the Flick Parties would transfer to Weddington title to certain real property and also specified other terms.
 

 The Deal Point Memorandum also contained a “Licensing Agreement” clause and an ADR clause, both discussed next below. The Deal Point Memorandum ended by stating: “There are no other significant terms.”
 

 e.
 
 The Licensing Agreement clause and the ADR clause.
 

 (1)
 
 The Licensing Agreement clause.
 

 The Licensing Agreement clause provided: “[t]he parties will formalize a Licensing Agreement recognizing the Weddington Library to remain the property of. . . Weddington, but with a fully paid up license to Flick for use in sound editing services by Flick or by his corporation, or any corporation owned together with family, to use, or to devise to family members as the library existed on July 31, 1995.” Neither the term “Licensing Agreement” nor “fully paid up license” was further defined. The only other terms in the Deal Point Memorandum relating to the sound library were that the parties would “cooperate to number and index” the library, that Mr. Flick would “return all masters,” that Weddington would give Mr. Flick access “to replace any copy predating 7/31/95,” and that “[a]ll parties will respect 3rd party restrictions (e.g., Disney).” Nothing further was said about the library and no other details of the proposed Licensing Agreement were stated in the Deal Point Memorandum.
 

 (2)
 
 The materiality of the Licensing Agreement.
 

 The record clearly shows that the Licensing Agreement was centrally material to both sides. The Flick Parties relied upon access to the sound
 
 *800
 
 library to earn their livelihood as sound effects editors. As Mr. Flick stated in his declaration, “I am a sound effects editor. That is my only means of employment and to preclude me from acting as a sound effects editor and using the Sound Effects Library as my tool of trade . . . would preclude me from making a living.” As Weddington itself stated in its application for the preliminary injunction, “[i]f Flick did not have access to the Library, Flick could not perform services for, or meet the needs, of the Production Companies.” The terms of the Licensing Agreement were therefore obviously material to the Flick Parties. Those terms, whatever they might be, would control the Flick Parties’ future careers.
 

 The Licensing Agreement was also material to Weddington, as was conceded at oral argument. In seeking the injunction, Weddington contended: “The sound effects library ... is Weddington’s most valuable asset.” According to Weddington, “rights of access to and use of the sound effects library owned by Weddington” was one of four issues “that needed to be resolved” in connection with Mr. Flick’s withdrawal from Weddington. According to Weddington, a sound library “is an indispensable tool to anyone in the sound editing business .... One cannot conduct a sound editing business . . . without a high quality and well catalogued sound library.” Weddington sought and obtained injunctive relief by alleging that Weddington would suffer irreparable injury if the Flick Parties were permitted uncontrolled use of the sound library.
 

 The proposed Licensing Agreement was therefore of central material importance to both sides. Agreement on the material terms of the Licensing Agreement was hence essential to contract formation, as will be further developed in the legal discussion below. As subsequent events were to prove, there had been no meeting of the minds on the meaning of the terms “Licensing Agreement” or “fully paid up license” as of the time the Deal Point Memorandum was signed.
 

 (3)
 
 The ADR clause.
 

 The Deal Point Memorandum also contained an ADR clause providing: “All parties agree this settlement is enforceable under CCP 664.6, and reserve jurisdiction in [the private judge] to resolve any dispute that may occur in the documentation of a full Settlement Agreement or the Licensing Agreement, and in the implementation of the settlement. [The private judge] may administer any process, including fact-finding if necessary, for a full implementation of the settlement.”
 

 The reference to enforceability pursuant to section 664.6 suggests that the parties subjectively thought they had formed a settlement contract. Nevertheless, subsequent events illustrate quite vividly that they had never agreed
 
 *801
 
 on the same terms for a Licensing Agreement. As discussed below, the law of contracts precludes specific enforcement of a contract when it cannot be determined exactly what terms the parties agreed upon. Beyond this, the reference to section 664.6 has little significance since any settlement agreement memorialized in a signed writing is enforceable pursuant to section 664.6, whether the agreement expressly so states or not.
 

 The meaning of the balance of the clause is debatable. The Flick Parties contend that it “reserved” only the “jurisdiction” the private judge already had: to conduct a mediation. Weddington contends that the references to section 664.6 empowered the private judge to select licensing agreement terms and to impose those terms on the parties. It has not been disputed that parties theoretically could confer wide-ranging arbitration authority on an arbitrator, even to the extent of allowing an arbitrator to write a licensing agreement for them. However, Weddington has never argued that the clause calls for some sort of arbitration process, and neither the private judge nor the superior court judge treated the clause as an arbitration clause. Moreover, no motion to compel arbitration or to confirm an arbitration award was ever filed. Any possible claim that the ADR clause is an arbitration agreement has therefore been waived, and the validity of the judgment must stand or fall on section 664.6.
 
 [2]
 

 f.
 
 The post-Deal Point Memorandum ADR proceedings.
 

 (1)
 
 Numerous disagreements surface over material terms.
 

 Following the signing of the Deal Point Memorandum, the parties commenced efforts to “formalize a Licensing Agreement” and to prepare a “full Settlement Agreement” as provided in the Deal Point Memorandum. Letters and drafts were exchanged and red-lined, and discussions took place. Disagreements soon became obvious regarding numerous material terms of the proposed licensing agreement. For example, disputes involved material issues such as how the library should be defined and exactly what it encompassed; the scope of the uses permitted to the Flick Parties; the scope of the Flick Parties’ permitted access to the master tapes; whether different Flick
 
 *802
 
 entities, such as both Mr. Flick and the corporation Creative Cafe, could simultaneously utilize the library for different projects and possibly in different locations; the copyright implications of the Licensing Agreement; what duties the Flick Parties would have, if any, to protect Weddington’s interests, such as possibly to provide insurance; whether the Flick Parties had the duty to indemnify Weddington and, if so, under what circumstances; whether the Licensing Agreement could be terminated by Weddington and, if so, on what basis and by what procedure; whether the Licensing Agreement would contain an arbitration clause, or whether the parties would retain their right to trial by jury in case of a dispute; whether, if arbitration was specified, the arbitrator would be authorized to engage his or her own experts, etc.
 

 Although the record suggests continuing dispute over subjects other than the Licensing Agreement, the ADR proceedings which followed the Deal Point Memorandum focused on the Licensing Agreement. We also focus on the Licensing Agreement here, since examination of the Licensing Agreement issue alone is enough to show quite clearly that the parties neither reached, nor objectively manifested, a meeting of the minds on the material terms of a settlement.
 

 (2)
 
 The post-Deal Point Memorandum ADR proceedings commence.
 

 When the Flick Parties and Weddington could not agree on the terms of a Licensing Agreement, Weddington filed a “Motion to Specifically Enforce Settlement” with the private judge, styling it a motion pursuant to section 664.6. The parties and the private judge then engaged in a series of lengthy meetings which will here be termed collectively the “post-Deal Point Memorandum ADR proceedings.” The Flick Parties were apparently apprehensive about the nature and effect of these proceedings and consequently arranged for them (except for the first one) to be recorded by a court reporter. We thus have transcripts of four such sessions (including the last one which took place in the Flick Parties’ absence).
 

 (3)
 
 Disputes emerge regarding the nature of the post-Deal Point Memorandum ADR proceedings.
 

 The precise nature of the post-Deal Point Memorandum ADR proceedings was in dispute from the outset. Early in these proceedings, the private judge stated that the goal was to produce a document that would “go around the table for signature” and suggested that participation was voluntary, thus implying a continuing mediation. Weddington, however, insisted from the outset that the proceedings were “an enforcement motion pursuant to 664.6”
 
 *803
 
 and “a hearing under 664.6 to enforce the settlement deal point memorandum.” Soon the private judge began agreeing with Weddington’s characterization of the proceedings as a process authorized by section 664.6 to select and to impose a binding resolution, whether agreed to or not. The private judge thus ceased to act as a mediator, and embarked upon a role similar to that of judge or arbitrator, overruling objections by the Rick Parties and making rulings about what terms the Licensing Agreement would contain.
 

 The Rick Parties consistently contended that the proceedings were only a continuation of mediation, and insisted that their participation was not a concession that the private judge had any power to select and impose Licensing Agreement terms. The Rick Parties repeatedly stated their contention that the ADR clause, by which the parties agreed to “reserve jurisdiction” in the private judge, “reserved” only that “jurisdiction” which had previously been bestowed upon the private judge to conduct a mediation. For example, counsel for the Rick Parties stated “. . . as I understand the reservation of jurisdiction, that is a reservation of that jurisdiction that you possessed at the outset of these proceedings, to wit, mediation,” and “Your Honor, I want to say because I’m participating in these discussions does not mean that on behalf of the Flicks I’m agreeing to this. Ultimately we’re going to reserve our right to agree or not agree to the agreement. I’m trying to make it as positive an agreement as possible for the Ricks in the hope that they will believe they can live with it and sign it.”
 

 (4)
 
 Impasse is averted; agreement is reached to continue discussions.
 

 After the private judge unequivocally stated his view that section 664.6 and the ADR clause of the Deal Point Memorandum authorized him to select the terms of a Licensing Agreement and to impose those terms upon the Rick Parties, the Flick Parties stated that they would proceed with a mediation and nothing more. The proceedings then teetered on the brink of termination during extended discussion about the nature of the proceedings. At the urging of the private judge, all parties eventually agreed that the Rick Parties could continue to participate without waiving their contention that only a voluntary mediation, and not a procedure by which the private judge could select and impose a resolution, was in progress.
 

 (5)
 
 No agreement on licensing terms is ever reached.
 

 The transcripts, together with related documents filed by the parties with the private judge and later with the superior court, show that many different Licensing Agreement terms were proposed and discussed. Two facts emerge quite clearly. First, at the time of the Deal Point Memorandum, no meeting
 
 *804
 
 of the minds had yet occurred between the Flick Parties and Weddington regarding the material terms of a Licensing Agreement. Second, no such meeting of the minds occurred during the post-Deal Point Memorandum ADR proceedings. The record is voluminous, but a few examples will illustrate these points.
 

 The private judge noted near the outset of the post-Deal Point Memorandum ADR proceedings that none of the settlement terms could reasonably be implemented “when we can’t even come to a basic understanding of the document format that’s going to serve as the basis for the license agreement.” Weddington then cited “practice in the community” as authority for the license terms it proposed, and presented examples of licenses from treatises and elsewhere illustrating various possible clauses. After counsel for the Flick Parties objected to the private judge’s approval of a particular indemnity provision, the private judge told him that he had “the burden of going forward if you think that there are texts or cases that would demonstrate that an indemnification provision is not a feature—an appropriate feature or a usual feature I should say in custom and practice in licensing agreements.” At one point the private judge suggested that no settlement could be implemented when “there is still significant dispute about the library.” The subject of termination terms also generated significant controversy. Responding to protestations from counsel for the Flick Parties that no agreement had been reached during negotiation of the Deal Point Memorandum on a termination clause for the licensing agreement, the private judge stated “You said that a termination provision was not negotiated in the [Deal Point Memorandum] and I’m agreeing that we did not spend my time discussing a termination provision because many provisions are implied or would become a matter of further meet-and-confer and discussion between counsel.” Numerous other material issues were also hotly contested, for example concerning whether the Licensing Agreement would contain an arbitration clause, issues of indemnity and scope of use, etc.
 

 (6)
 
 The private judge applies a “consistent with” or “not inconsistent with” test.
 

 The private judge regularly stated his belief that he was authorized to choose Licensing Agreement terms which, in his opinion, were either “consistent with” or “not inconsistent with” the Deal Point Memorandum. The private judge thus often inquired whether certain terms were “customary” or “true to the settlement discussions.” On one occasion the private judge acknowledged unfamiliarity with what types of terms were “customary” on a particular point, and entertained argument on the point and asked for reference to “a text” on the subject. In discussing a proposed provision regarding
 
 *805
 
 how many days should be allowed for cure of a breach, the private judge asked: “Can you help me with some practical experience because this is clearly a matter for negotiation .... Can you offer some practical experience that suggests that 60 is a more appropriate period or 30 or any other time period?” Ultimately, the private judge decided that “15 business days” was an appropriate period, and that is the number that ultimately appeared in the private judge’s “order” and which now appears in the resulting superior court judgment, notwithstanding that the Flick Parties never agreed to it. On another occasion the private judge stated that he saw no “prejudice” in a provision proposed by Weddington, “so I will not require it to be removed.”
 

 Assuming that a private judge were given the authority, as theoretically might be done in an arbitration agreement, to select and impose the terms of a licensing agreement, a private judge who proceeded as the private judge did here can be considered to have proceeded in a reasonable and skillful manner. However, the issue we consider is whether the decisions of the private judge here can be enforced pursuant to section 664.6. Counsel for the Flick Parties continually objected, stating at one point: “it was not my clients’ understanding that some agreement would be hammered out based upon a view of what would be consistent with what the . . . deal point memorandum said.”
 

 The private judge eventually refined the “consistent or not inconsistent” test by inquiring whether a proposed Licensing Agreement term did or did not create a “substantive right.” For example, the private judge stated “Again, my focus is going to be to determine whether the document [the Licensing Agreement] is consistent with the settlement. . . . One way of measuring that is whether it creates any substantive rights that are not implied in the agreement . . . .” After the private judge declared what termination provision the Licensing Agreement would contain, stating that the provision “does not in my opinion create a substantive right,” counsel for the Flick Parties objected: “Shouldn’t the test be whether that appears in the deal point memorandum and not whether it creates a substantive right . . . ?” The private judge replied: “No. That’s the whole reason we’re going through this process is because the deal point memorandum was not designed to include every provision of the licensing agreement.” Counsel for the Flick Parties then responded: “I must say for the record that my clients never envisioned this process. I don’t believe they agreed to anything more than what they agreed to in that deal point memorandum and this process of making up an agreement that’s 10 to 20 times as long as that deal point memorandum is one that I just can’t find any basis for.”
 

 The transcripts thus show clearly that both Weddington and the private judge fully understood that they were not involved in an effort to identify
 
 *806
 
 Licensing Agreement terms
 
 to which the Flick Parties had already agreed,
 
 but instead were searching for Licensing Agreement terms which
 
 the private judge
 
 would accept as
 
 “consistent”
 
 with the Deal Point Memorandum, whether or not the Flick Parties agreed to those terms.
 

 (7)
 
 The post-Deal Point Memorandum ADR proceedings collapse; Weddington and the private judge proceed alone.
 

 Disputes continually boiled to the surface regarding the nature of the proceedings and the authority of the private judge, leading the private judge to state at one point: “It will still be my effort because I think it’s my responsibility and partly because the parties charged me with that responsibility and partly because that’s the way it’s supposed to work under 664.6 that I should forge ahead to work out a licensing agreement and the matters that still need to be resolved. . . . I’ll move ahead to flush [sic] out the document we will call the licensing agreement.” By the time of the third post-Deal Point Memorandum ADR session, the volume of proposed licensing agreement terms and related correspondence that had passed among the parties and the private judge had become quite large. Commenting on this, the private judge noted “The post-settlement paper has now reached the same volume as the pre-settlement paper in this particular matter. . . . But moving forward I think our task is to work forward in the licensing agreement . . . .” The private judge then suggested the creation of an agenda of “the items that need discussion,” noting that he had received “samples” of proposed provisions from both sides. Referring to the continuing protestations from the Flick Parties, the private judge stated, “ . . .1 made reference to the fact that [the Flick Parties] might choose not to sign, [but] that doesn’t mean that there won’t be an enforceable settlement. They can withhold their signature but that may have no effect on whether or not there’s an enforceable settlement.”
 

 When the Flick Parties concluded that further discussions were not likely to produce an acceptable licensing agreement, they declined to participate further. By letter dated three days before the final scheduled ADR session, the Flick Parties explained that they “no longer believe that participation in the mediation is likely to lead to a mutually-acceptable license agreement with respect to the ‘library.’ ”
 

 When the Flick Parties did not appear for the final ADR session, Weddington and the private judge continued discussions in their absence. Weddington and the private judge finalized a 14-page “Settlement Agreement and Mutual General Release of Known and Unknown Claims” and a 14-page (including exhibits) “License Agreement.” These documents were appended
 
 *807
 
 to the private judge’s “Order Enforcing Settlement Agreement, etc. and Awarding Attorneys’ Fees.” In signing this “order,” the private judge stated: “I have now approved the licensing agreement . . . .” Upon being told that the Licensing Agreement document just “approved” contained an arbitration clause that was different from the arbitration clause in the settlement agreement document, and hearing a suggestion from Weddington that the provision in the settlement agreement be replaced with the provision from the Licensing Agreement, the private judge stated: “I approve that change.”
 

 Weddington then questioned whether the payments to the Flick Parties specified in the Deal Point Memorandum would really have to be made according to the agreed schedule. Weddington argued that the Flick Parties should not be entitled to the payments as scheduled because they had refused to agree to the Licensing Agreement terms “approved” by the private judge. The private judge responded: “You authorized me to make fact findings in connection with the resolution of this settlement and the documentation of it and I’m now prepared to make a fact finding that Mr. Flick is not acting in good faith in connection with the settlement and that in the absence of good faith I could not see that he could expect” payment according to the schedule in the Deal Point Memorandum. Expanding on this comment, the private judge stated “let me simply say that with the finding of lack of good faith on the part of Mr. Flick I could not find it appropriate to—that Mr. Rick could expect a payment of $100,000 five days from today [as the Deal Point Memorandum provided] and in the event that he does approve the licensing agreement and settlement agreement and signs it within 30 days of today, then it would seem appropriate and reasonable that Weddington . . . have 15 business days within which to make the payment called for on November 30.” The judgment later entered by the superior court altered the payment schedule specified in the Deal Point Memorandum to allow Weddington to delay payment of the agreed amounts. While the record is not completely clear as to how this occurred, the superior court’s alteration of the payment schedule agreed to in the Deal Point Memorandum was apparently based on the private judge’s finding that the Rick Parties were not acting in “good faith.”
 

 g.
 
 The motions in the superior court.
 

 (1)
 
 The Flick Parties’ motion.
 

 Following these events, the Rick Parties were the first to make a motion in the superior court. They moved to enforce the Deal Point Memorandum alone as a settlement pursuant to section 664.6. The Flick Parties’ moving
 
 *808
 
 papers emphasized the language from the Deal Point Memorandum which stated that the “settlement is enforceable under CCP 664.6” and that “[flhere are no other significant terms.” The theory of the Flick Parties’ motion is not completely clear, and it may have been simply a preemptive strike designed to ward off an anticipated Weddington motion to enforce the Licensing Agreement crafted by the private judge. Otherwise, the Flick Parties’ theory appeared to be that the Deal Point Memorandum entitled the Flick Parties to unconditional access and to unconditional use of Weddington’s sound library, except for the minimal restrictions expressly stated in the Deal Point Memorandum itself.
 
 [3]
 
 However, as Weddington notes in its brief on appeal, “pursuant to the explicit language of the Deal Point Memorandum, the only document upon which [the Flick Parties] sought
 
 entry
 
 of judgment, settlement documentation is not complete without an overall settlement a[nd] license agreement. That is, on its face, the Deal Point Memorandum is not enforceable pursuant to CCP § 664.6 by itself, and cannot possibly serve as the final judgment of the court.”
 

 While both Weddington and the Flick Parties clearly agreed to the words “Licensing Agreement” and “fully paid up license” in the Deal Point Memorandum, the record summarized and highlighted above graphically shows that there was never any meeting of the minds, either subjectively or objectively, as to exactly what these words meant. Hence, as will be apparent from the legal discussion below, there is substantial evidence supporting the proposition that the Deal Point Memorandum did not constitute an enforceable contract. The superior court therefore did not err in denying the Flick Parties’ motion to specifically enforce the Deal Point Memorandum as a judgment. The Flick Parties have appealed from that denial, but we will affirm it.
 

 (2)
 
 Weddington’s motion.
 

 Shortly after the Flick Parties filed their motion to enforce the Deal Point Memorandum pursuant to section 664.6, Weddington filed its own motion. Weddington’s motion did not seek to enforce just the Deal Point Memorandum, but instead sought to enforce the private judge’s “Order Enforcing Settlement Agreement, etc. and Awarding Attorneys’ Fees.” Weddington thus sought to specifically enforce not merely the Deal Point Memorandum, but also the Licensing Agreement written by the private judge. The Flick Parties opposed on numerous grounds.
 

 The superior court recognized that the Flick Parties had never agreed to the terms contained in the private judge’s “order,” and had never signed any
 
 *809
 
 “writing” containing those terms. Nevertheless, the superior court placed great importance on the proceedings which had taken place before the private judge. The superior court noted that the private judge had “considered all the arguments which are here presented and just as certainly rejected each and every one of them. Accordingly, it seems to me that [Wedding-ton’s] motion should be granted . . . .” Weddington’s motion was granted on this basis. In subsequent proceedings regarding the proper form of the judgment, the payment schedule agreed to in the Deal Point Memorandum was modified in Weddington’s favor as noted above. The one-page Deal Point Memorandum thus became a thirty-five page judgment including a licensing agreement containing numerous material provisions never agreed to by the Flick Parties. It is this judgment which must be reversed.
 

 II. Discussion as to Section 664.6.
 

 a.
 
 The terms of section 664.6.
 

 Prior to the enactment of section 664.6, a party seeking to enforce a settlement agreement had to file a new action alleging breach of contract and seeking either contract damages or specific performance of the settlement terms, or alternatively had to supplement the pleadings in a pending case. (See, e.g., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial,
 
 supra,
 
 ¶ 12:951, p. 12(II)-70;
 
 Viejo Bancorp, Inc.
 
 v.
 
 Wood
 
 (1989) 217 Cal.App.3d 200, 208 [265 Cal.Rptr. 620] [“Prior to the enactment of section 664.6, a party who sought to enforce a settlement agreement could file a separate action for specific performance, or could seek leave to file a supplemental pleading in the first action.”] Although a summary judgment motion could be filed based on the newly pleaded contract or specific performance claim, summary judgment could be granted only if the opposing party failed to raise a triable issue of fact. (See, e.g., Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial,
 
 supra,
 
 1[ 12:951, p. 12(II)-70.) Expeditious enforcement of a settlement agreement was therefore not always possible.
 

 Section 664.6 was enacted to provide a summary procedure for specifically enforcing a settlement contract without the need for a new lawsuit. (Cf.
 
 Viejo Bancorp, Inc.
 
 v.
 
 Wood, supra,
 
 217 Cal.App.3d 200;
 
 In re Jason E.
 
 (1997) 53 Cal.App.4th 1540 [62 Cal.Rptr.2d 416] [treating section 664.6 motion as a request for summary specific performance].) The judgment in the instant case specifically enforced the private judge’s “order,” as modified to delay Weddington’s payments, as can easily be seen by reference to its terms: it not only orders the payment of money according to a specified schedule, but also the transfer of real property, the terms of a
 
 *810
 
 license agreement, an arbitration clause, and many other terms in great detail. Although a judge hearing a section 664.6 motion may receive evidence, determine disputed facts, and enter the terms of a settlement agreement as a judgment (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial
 
 supra,
 
 ¶ 12:975 et seq., pp. 12(II)-76 to 12(II)-82-7;
 
 Fiore
 
 v.
 
 Alvord
 
 (1985) 182 Cal.App.3d 561 [221 Cal.Rptr. 400] [court may interpret terms of settlement agreement]), nothing in section 664.6 authorizes a judge to
 
 create
 
 the material terms of a settlement, as opposed to deciding what terms
 
 the parties themselves
 
 have previously agreed upon.
 

 In order to be enforceable pursuant to the summary procedures of section 664.6, a settlement agreement must either be entered into orally before a court (a possibility not involved here) or must be in writing and signed by the parties. The reason for the party-signature requirement is that “settlement is such a serious step that it requires the client’s knowledge and express consent. (1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 194, pp. 221-222.)”
 
 (Levy
 
 v.
 
 Superior Court
 
 (1995) 10 Cal.4th 578, 583 [41 Cal.Rptr.2d 878, 896 P.2d 171].) “. . . in 1981 ... the Legislature enacted section 664.6, which created a summary, expedited procedure to enforce settlement agreements when certain requirements that decrease the likelihood of misunderstandings are met. Thus the statute requires the ‘parties’ to stipulate in writing or orally before the court that they have settled the case. The litigants’ direct participation tends to ensure that the settlement is the result of their mature reflection and deliberate assent. This protects the parties against hasty and improvident settlement agreements by impressing upon them the seriousness and finality of the decision to settle, and minimizes the possibility of conflicting interpretations of the settlement. (See
 
 In re Marriage of Assemi
 
 [(1994)] 7 Cal.4th [896,] 905 [30 Cal.Rptr.2d 265, 872 P.2d 1190];
 
 City of Fresno
 
 v.
 
 Maroot
 
 [(1987)] 189 Cal.App.3d [755,] 762 [234 Cal.Rptr. 353];
 
 Datatronic Systems Corp.
 
 v.
 
 Speron, Inc.
 
 [(1986)] 176 Cal.App.3d [1168,] 1174 [222 Cal.Rptr. 658].) It also protects parties from impairment of their substantial rights without their knowledge and consent.
 
 (See Blanton
 
 v.
 
 Womancare, Inc.
 
 [(1985)] 38 Cal.3d [396,] 404 [212 Cal.Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109].) [Fn. omitted.]”
 
 (Levy, supra,
 
 10 Cal.4th at pp. 585-586.)
 

 Thus in the circumstances of the instant case, no settlement can be specifically enforced against the Flick Parties pursuant to section 664.6 unless it can be found that the Flick Parties expressly consented in writing to the material terms of that settlement.
 

 b.
 
 The controlling principles of contract law.
 

 A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts. (See, e.g.,
 
 Gorman
 
 
 *811
 
 v.
 
 Holte
 
 (1985) 164 Cal.App.3d 984, 988 [211 Cal.Rptr. 34] [“Compromise settlements are governed by the legal principles applicable to contracts generally”].) An essential element of any contract is “consent.” (Civ. Code, § 1550; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 6, p. 44.) The “consent” must be “mutual." (Civ. Code, § 1565; 1 Witkin, Summary of Cal. Law,
 
 supra,
 
 Contracts, § 119, p. 144 [“Every contract requires mutual assent or consent.”];
 
 Meyer
 
 v.
 
 Benko
 
 (1976) 55 Cal.App.3d 937 [127 Cal.Rptr. 846].) “Consent is not mutual, unless the parties all agree upon the same thing in the same sense.” (Civ. Code, § 1580; see also Civ. Code, § 1636 [contracts must be enforced according to the “mutual intention of the parties as it existed at the time of contracting.”].)
 

 “The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.”
 
 (Meyer
 
 v.
 
 Benko, supra, 55
 
 Cal.App.3d 937, 942-943.) Outward manifestations thus govern the finding of mutual consent required by Civil Code sections 1550, 1565 and 1580 for contract formation. (See also 1 Witkin, Summary of Cal. Law,
 
 supra,
 
 Contracts, § 119, p. 144 [“. . . the outward manifestation or expression of assent is controlling. Mutual assent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding.”].) The parties’ outward manifestations must show that the parties all agreed “upon the same thing in the same sense.” (Civ. Code, § 1580.) If there is no evidence establishing a manifestation of assent to the “same thing” by both parties, then there is no mutual consent to contract and no contract formation. (Civ. Code, §§ 1550, 1565 & 1580.)
 

 In order for acceptance of a proposal to result in the formation of a contract, the proposal “must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain.” (1 Witkin, Summary of Cal. Law,
 
 supra,
 
 Contracts, § 145, p. 169.) A proposal “ ‘cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain. [*][]... The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.’ ”
 
 (Ibid.,
 
 quoting from Rest.2d Contracts, § 33.) If, by contrast, a supposed “contract” does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract. (See, e.g., 1 Williston on Contracts (4th ed. 1990) § 4:18, p. 414 [“It is a necessary requirement that an agreement, in order to be binding, must be sufficiently definite to enable the courts to give it an exact meaning.”]; see also Civ. Code, § 3390, subd. 5 [a contract is not specifically enforceable unless the terms are
 
 *812
 
 “sufficiently certain to make the precise act which is to be done clearly ascertainable.”].) “In particular ... a provision that some matter shall be settled by future agreement, has often caused a promise to be too indefinite for enforcement.” (1 Williston,
 
 supra,
 
 § 4:18, pp. 418-420.) “[I]f an essential element is reserved for the future agreement of both parties, as a general rule the promise can give rise to no legal obligation until such future agreement. Since either party in such a case may, by the very terms of the promise, refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise.”
 
 (Id.,
 
 § 4:26, pp. 585-587, fn. omitted.)
 

 Ladas
 
 v.
 
 California State Auto. Assn.
 
 (1993) 19 Cal.App.4th 761, 771 [23 Cal.Rptr.2d 810], provides an example of a supposed contract that was too uncertain to support enforcement. Plaintiffs were insurance sales representatives who claimed that their employer had breached a contract to “consider” parity with other insurance companies in setting compensation rates. The
 
 Ladas
 
 court held this alleged contract too uncertain to be enforceable, stating: “An amorphous promise to ‘consider’ what employees at other companies are earning cannot rise to the level of a contractual duty. ... By what standard would a court or a jury determine that the [employer] failed to meet its obligation to ‘consider’ commissions earned by competitors? What would be the relevant market on which such a duty would be predicated? [The employer’s] four major competitors? All insurers in the state? Eighty companies nationwide? How would ‘damages’ be calculated? By totaling up all yearly commissions earned by other agents, averaging them and subtracting the difference? By coming up with an ‘industry standard’ factor and increasing [the employer’s] unit value ratio by that factor? The nature of the obligation asserted provides no rational method for determining breach or computing damages.” The court thus found no contract.
 

 Peterson Development Co.
 
 v.
 
 Torrery Pines Bank
 
 (1991) 233 Cal.App.3d 103 [284 Cal.Rptr. 367], was a similar case. In
 
 Peterson
 
 a builder sued a lender, claiming breach of a contract to provide take-out financing. The builder relied on a “letter of commitment,” but the “letter of commitment” did not specify identity of the borrower (whether the builder or his home-buyers), loan amount, percentage of purchase price, interest rates or repayment terms. The court preliminarily noted that “ ‘[a] loan commitment is not binding on the lender unless it contains all of the material terms of the loan, and either the lender’s obligation is unconditional or the stated conditions have been satisfied. When the commitment does not contain all of the essential terms ... the prospective borrower cannot rely reasonably on the commitment, and the lender is not liable for either a breach of the contract or promissory estoppel.’ (9 Miller & Starr, [Cal. Real Estate (2d ed. 1989)]
 
 *813
 
 § 28.4, at p. 8, fn. omitted.) The material terms of a loan include the identity of the lender and borrower, the amount of the loan, and the terms for repayment.”
 
 (Id.
 
 at p. 115.) The court then found the material terms not stated with sufficient certainty to create a contract, stating: “These material contractual terms of the letter of commitment are so broadly defined that they do not appear to be capable of being made certain; on this record, no binding agreement could have been reached to supply permanent financing on mutually agreed-upon terms. ... No enforceable contract to provide permanent financing is created by this document.”
 
 (Ibid.)
 

 Goldberg
 
 v.
 
 City of Santa Clara
 
 (1971) 21 Cal.App.3d 857 [98 Cal.Rptr. 862], provides another example. In
 
 Goldberg,
 
 an attorney had a contract calling for additional compensation if he achieved “savings to the City of such magnitude” as would justify additional compensation. The court found these terms “too vague to permit a true meeting of the minds.” (21 Cal.App.3d at p. 863; see also 1 Witkin, Summary of Cal. Law,
 
 supra,
 
 Contracts, § 146, p. 169 [collecting cases in which supposed contracts were found too uncertain and hence unenforceable].)
 

 A related situation is distinguishable. There are occasions in which “minor matters” in elaborate contracts are left for future agreement. When this occurs, it does not necessarily mean that the entire contract is unenforceable. “The Restatement suggests as an illustration of this a building contract which is definite in all particulars except for a provision that the form of window fastening shall be afterwards be agreed upon .... This would not make the entire building contract unenforceable; by contrast, if the nature of the window fastenings was fixed by the agreement while the dimensions of the building were left to future agreement, there would be no enforceable obligation. Obviously, the question is one of degree; the question is whether the indefinite promise is so essential to the bargain that inability to enforce that promise strictly . . . makes it also unfair to enforce the remainder of the agreement. The more important the subject matter to be agreed upon, the more likely it is that the uncertainty will prevent or hinder enforcement. If the contract cannot be performed without settlement of the undetermined point ... the entire contract may fail.” (1 Williston on Contracts,
 
 supra,
 
 § 4:28, pp. 602-605, fns. omitted.) The “minor matter” situation is not presented in the instant case. If this “minor matter” body of law applied here, it might justify enforcement of the other provisions of the Deal Point Memorandum, with the issue of right to use the library reserved for trial. However, neither party has asked for that remedy, and Weddington specifically declined it when suggested during oral argument. Moreover, the record in the instant case makes clear that the Licensing Agreement is centrally material, and not a “minor matter.”
 

 
 *814
 
 A settlement agreement which incorporates other documents can be enforced pursuant to section 664.6, but only if there was a meeting of the minds regarding the terms of the incorporated documents. In
 
 Corkland
 
 v.
 
 Boscoe
 
 (1984) 156 Cal.App.3d 989, 992 [203 Cal.Rptr. 356], for example, the court specifically enforced a settlement agreement in a real estate case, stating “ ‘it is clear that the settlement agreement includes not only that document denominated “Settlement Agreement,” but the two promissory notes and deeds of trust
 
 executed pursuant thereto and later withdrawn by Boscoe.
 
 It is indisputed [sic] that there was a meeting of the minds of all the parties as to all material portions of the notes and deeds, and there is no substantial reason to further delay the consummation of the agreement.’ ”
 

 In
 
 Chan
 
 v.
 
 Drexel Burnham Lambert, Inc.
 
 (1986) 178 Cal.App.3d 632, 641-642 [223 Cal.Rptr. 838], the court stated “ ‘[a] contract may validly include the provisions of a document not physically a part of the basic contract. . . . “It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.]
 
 But each case must turn on its facts.
 
 [Citation.]
 
 For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties."
 
 ’
 
 (Williams Constr. Co.
 
 v.
 
 Standard-Pacific Corp.
 
 (1967) 254 Cal.App.2d 442, 454 [61 Cal.Rptr. 912], italics added; accord
 
 King
 
 v.
 
 Larsen Realty, Inc.
 
 [(1981)] 121 Cal.App.3d [349,] 357 [175 Cal.Rptr. 226].) [¶ In
 
 King,
 
 arbitration provisions were determined to be incorporated into a contract, where: (1) appellant Larsen, upon applying for membership in a local real estate board, had read the bylaws requiring arbitration; (2) appellant Doty had read his application prior to signing it, which application required the applicant to abide by all bylaws, and Doty enjoyed familiarity with the arbitration manual, having referred thereto on occasion; and (3) the arbitration manual was readily available to both appellants.
 
 (Id.,
 
 at pp. 353, 357.)”
 

 The purported settlement in the instant case, supposedly memorialized in the Deal Point Memorandum, thus might be enforcable even though all terms of the Licensing Agreement were not expressly stated in the Deal Point Memorandum. However, this could be true only if the parties had objectively manifested a “meeting of the minds” as to “all material portions” of the licensing agreement, perhaps by reference to a standardized document, so that their use of the terms “Licensing Agreement” and “fully paid-up license” could be found to have a specific, understood and agreed meaning.
 

 
 *815
 
 c.
 
 The standard of review.
 

 Factual determinations made by a trial court on a section 664.6 motion to enforce a settlement must be affirmed if the trial court’s factual findings are supported by substantial evidence.
 
 (In re Marriage of Assemi
 
 (1994) 7 Cal.4th 896, 911 [30 Cal.Rptr.2d 265, 872 P.2d 1190];
 
 Fiore
 
 v.
 
 Alvord, supra,
 
 182 Cal.App.3d 561.) Other rulings are reviewed de novo for errors of law. (9 Witkin, Cal. Procedure,
 
 supra,
 
 Appeal, § 316, p. 354.)
 

 d.
 
 Application of the law to the facts of this case.
 

 (1)
 
 The Licensing Agreement was material.
 

 As the factual recitation above shows, the issue of the use of the sound library was a material issue to both sides. This is clearly not a case in which the terms of the Licensing Agreement can be regarded as a minor, immaterial or separable issue, and both parties acknowledge that. Therefore, if there was no licensing contract, there was no contract at all.
 

 (2)
 
 The question is whether contract formation took place.
 

 The analysis in the post-Deal Point Memorandum ADR proceedings and in the trial court seems to have been deflected off course by the settlement context and a fervor that ADR be successful. The fact that the context was one of settlement negotiation, however, has no analytical impact on the question of whether an enforceable contract was ever formed. Section 664.6 provides only for enforcement of settlement
 
 contracts.
 
 Contracts are formed in the same way in both the settlement and the nonsettlement context. (See, e.g., Civ. Code, § 1550 et seq. and discussion,
 
 ante.)
 
 The analysis necessary here may therefore be brought into sharper focus by parsing out and disregarding the settlement context. The ultimate issue here is simply whether the parties formed an enforceable licensing contract. The question can thus be stated as whether the record here would support a judgment that Weddington and the Flick Parties had agreed upon an enforceable license agreement. Clearly the answer is no. The facts clearly show that “mutual consent” to the “same thing” never occurred. Moreover, if the section 664.6 context is taken into account, the additional requirement of a signed writing must be satisfied. The evidence is uncontradicted that the parties never objectively manifested agreement, and certainly not in writing, to such material terms as the scope of the license, permitted uses, grounds and procedures for termination, indemnity provisions, whether the license would contain an arbitration clause or whether the right to jury trial would be preserved, etc. It is
 
 *816
 
 therefore clear that no specifically enforceable license contract was ever formed.
 

 (3)
 
 The White Point case.
 

 White Point Co.
 
 v.
 
 Harrington
 
 (1968) 268 Cal.App.2d 458 [73 Cal.Rptr. 885] is closely on point.
 
 White Point
 
 involved escrow instructions for an alleged real estate sale contract and a related promissory note secured by a deed of trust. The issue of whether contract formation had occurred was created by an ambiguous clause providing for piecemeal release of the real property from the deed of trust. Although the trial court “was impressed that the ambiguity of the provision for release clauses cast doubt upon the validity and enforceability of the contract... the court sought to incorporate therein an implied-in-law covenant of good faith requiring the parties ‘to sincerely and earnestly negotiate to complete adequate details so as to make the contract fair and reasonable.’ The court further declared ‘. . . I feel that the matter of formulating release details beyond the expressed fundamentals, in order to insure fairness, lends itself adequately to the supervisory capacity of the court.’ ” (268 Cal.App.2d 458, 464.) The court therefore “directed counsel for plaintiffs to prepare findings and to propose in writing the necessary details for implementing specific performance of the contract. (268 Cal.App.2d 458, 465.) Plaintiffs then filed a document entitled “Plaintiffs’ Proposed Details of Judgment,” which proposed a release clause. The court then incorporated that release clause, which defendants had never agreed to, into the judgment.
 
 (Ibid.)
 

 The Court of Appeal reversed. “It is well established,” stated the Court of Appeal, that “ ‘[a]n agreement cannot be specifically enforced unless the terms are “sufficiently certain to make the precise act which is to be done clearly ascertainable.” (Civ. Code, § 3390, subd. 5.) It must not only contain all the material terms but also express each in a reasonably definite manner. [Citations.]’
 
 (Spellman
 
 v.
 
 Dixon,
 
 256 Cal.App.2d 1, 3 [63 Cal.Rptr. 668].) The trial court in the instant case was clearly and with reason concerned about the ambiguity of the release clause provision in the escrow instructions which constitute the only concrete embodiment of the purported contract. If this provision constitutes a material term of the contract, rather than merely a term requiring good faith elaboration of detail, its patent uncertainty voids the entire agreement. The legal principles requiring that material terms be set forth in a reasonably definite manner ‘have been applied in denying specific performance of agreements which are incomplete, indefinite or uncertain with respect to the terms of payment of deferred balances or the terms of encumbrances representing such deferred balances. [Citations.]’
 
 (Magna Development Co.
 
 v.
 
 Reed,
 
 228 Cal.App.2d 230, 236 [39 Cal.Rptr. 284].) In
 
 *817
 
 recent years subordination agreements have frequently been reviewed by appellate courts with respect to the issues of uncertainty, materiality and fairness. Where the subordination provisions have been found uncertain and incapable of ascertainment by reference to an objective standard, the contracts have been deemed void for the uncertainty of a material provision [Citations.]”
 
 (White Point Co.
 
 v.
 
 Herrington, supra,
 
 268 Cal.App.2d 458, 465-466.) When such material details “ ‘are left to the future agreement of buyer and seller, then the contract is uncertain and unenforceable.’ ” (268 Cal.App.2d 458, 466, italics omitted.) “It has clearly been established,” the court explained, “that such clauses constitute material provisions of the contract. . . .”
 
 (Ibid.)
 
 “ ‘The rule ... is that when something is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. “Since either party, by the very terms of the promise, may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise.” [Citations.]’
 
 (Magna Development Co.
 
 v.
 
 Reed, supra,
 
 228 Cal.App.2d 230, 238.) There appearing no external standards nor any reference to custom and usage by which the parties in the present case agreed to be bound, and insufficient parol evidence of what the release clause was intended to contain, there was no sound legal basis upon which to supply the missing terms.” (268 Cal.App.2d 458, 468.)
 

 The Court of Appeal then turned to the trial judge’s efforts to create “a new agreement” for the parties, an effort similar to the one undertaken by the private judge in the instant case. These efforts were found invalid: “The court’s attempt to decree in the alternative that respondents pay cash for the property, or the parties negotiate in good faith acceptable terms for the release clause failed and the court was ultimately forced to its third alternative whereby the court supervised the drafting of the release clause. The court in this role in fact constructed, on the basis of judicial notice taken of legal custom and usage, a new agreement between the parties. ‘[I]t is a well-established principle that although custom is admissible for the purpose of interpreting the contract or agreement of the parties, or for furnishing details not expressly covered thereby, it is not admissible to
 
 establish
 
 a contract. [Citations.]’
 
 (Magna Development Co.
 
 v.
 
 Reed, supra,
 
 [228 Cal.App.2d 230, 240].) Only the valid and binding agreement of the parties, including all material terms well-defined and clearly expressed, may be ordered specifically performed.”
 
 (White Point Co.
 
 v.
 
 Herrington, supra,
 
 268 Cal.App.2d 458, 468.)
 

 White Point
 
 and the instant case are closely analogous. Both instances involve an attempt to conclude a contract, but a failure to agree on material terms. In
 
 White Point,
 
 the missing material terms were created by a superior
 
 *818
 
 court judge and then included in a judgment just as if the parties had agreed to them. In the instant case, the missing material terms were created by a private judge, and a superior court judge then specifically enforced those terms as a judgment, just as if the parties had agreed to them.
 

 (4)
 
 The superior court’s order enforcing the private judge’s “order” was an error.
 

 The superior court focused on what the private judge had considered and had “ordered.” To the extent that the superior court’s judgment was based simply on the proposition that the superior court should accept what the private judge had done, there is no legal basis for it, and it must be reversed. The private judge gained no authority from section 664.6 to select and impose the terms of a settlement agreement. There was no complaint for specific performance of a contract calling for some other form of ADR.
 
 [4]
 
 There was no complaint for declaratory relief regarding the effect of the ADR clause. The private judge could theoretically have been empowered to do what he did by an arbitration agreement, and the parties could hence have invoked the summary specific enforcement procedures of the Code of Civil Procedure relating to arbitration agreements, but both sides agree that they never did that.
 
 [5]
 
 The private judge himself hinted at the dubious validity of the post-Deal Point Memorandum ADR proceedings by commenting: “we’re treading on some new territory here in terms of the enforcement of a settlement and I’m perfectly comfortable going there because I know that that’s where our legal system is going . . . .” It thus appears hat the post-Deal Point Memorandum ADR proceedings were an attempt to “push the envelope” of section 664.6 into “new territory.” As the analysis above shows, these proceedings did push far beyond the boundaries of any existing legal authority.
 

 To the extent that the superior court’s judgment may have been based upon a factual finding that the parties had reached an agreement as to license terms, it must be reversed since such a conclusion must be supported by substantial evidence. Moreover, it is undisputed that there was no “writing signed by the parties” setting forth the terms of the licensing agreement. Hence the only possible basis on which the judgment here could properly have been entered would be a theory that the Deal Point Memorandum incorporated the terms of a licensing agreement by reference. However, no one has ever made that argument in the trial court or on appeal, and neither
 
 *819
 
 the private judge nor the superior court judge ever made such a finding. In addition, the transcripts and other documents filed by the parties show that there was no document of agreed content to which the parties were referring when they used the terms “Licensing Agreement” and “fully paid-up license” in the Deal Point Memorandum. To the contrary, the parties had sharply conflicting ideas of what terms a licensing agreement should contain. There is no substantial evidence supporting the superior court’s entry of that licensing agreement as a judgment. The judgment is therefore reversed.
 
 [6]
 

 III. Discussion as to the Preliminary Injunction.
 
 *
 

 IV. Disposition.
 

 The judgment entered pursuant to section 664.6 is reversed, including the award of attorney’s fees to Weddington. The denial of the Flick Parties’ motion to enter the terms of the Deal Point Memorandum as a judgment pursuant to section 664.6 is affirmed. The preliminary injunction and the motion denying modification of the injunction are affirmed. In view of developments, the preliminary injunction is modified as stated in (unpublished) part HI,
 
 ante.
 
 Appellants to recover costs on appeal. The matter is remanded for further proceedings not inconsistent with this opinion.
 

 Boren, P. J., and Nott, J., concurred.
 

 Petitions for a rehearing were denied January 26, 1998, and January 28, 1998, and respondent’s petition for review by the Supreme Court was denied April 22, 1998.
 

 [1]
 

 Because the parties did not resolve their conflict quickly enough to satisfy the superior court judge hearing the contempt proceeding, that judge later recalendared the proceedings
 
 *799
 
 and found the Flick Parties in contempt and fined them. The contempt finding and fine are not appealable and hence are not part of this appeal. (Code Civ. Proc., § 1222; see 9 Wilkin, Cal. Procedure (4th ed. 1997) Appeal, § 105, pp. 168-169; but see 8 Witkin, Cal. Procedure,
 
 supra,
 
 Extraordinary Writs, § 33, pp. 811-812.)
 

 [2]
 

 Even if the ADR clause were interpreted as an arbitration clause, it would not appear to be self-executing inasmuch as the clause does not expressly authorize ex parte arbitration proceedings nor does it incorporate any body of established arbitral rules, let alone any that provide for ex parte proceedings. (See, e.g., 6 Witkin, Cal. Procedure,
 
 supra,
 
 Proceedings Without Trial, § 495, p. 924 [discussing the type of arbitration agreement that is effective without court order]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 1997) ¶¶ 5:291 & 5:414.1 et seq., pp. 5-93, 5-128 to 5-175.) Since the ADR clause was not of the self-executing variety, and since no motion to compel arbitration was ever made, there is no legitimate issue of arbitration which could be raised by Weddington on appeal.
 

 [3]
 

 The only restrictions expressly stated in the Deal Point Memorandum were that Mr. Flick would return the “masters” and that all parties would “respect 3rd party restrictions (e.g. Disney).”
 

 [4]
 

 It seems doubtful that this ADR clause, given its ambiguities, would be specifically enforceable according to the general law of specific performance.
 

 [5]
 

 Nor was there a reference (see Code Civ. Proc., §§ 638 & 639), nor a temporary judge appointment (see Cal. Const., art. VI, § 21).
 

 [6]
 

 The Hick Parties also raise Evidence Code section 1152.5, which restricts the admissibility of “evidence of anything said or of any admission made in the course of [a] mediation.” The Hick Parties regard the post-Deal Point Memorandum ADR proceedings as a continuing mediation. They further contend that the Deal Point Memorandum should be specifically enforced without embellishment. They hence quite consistently contend that the transcripts of the post-Deal Point Memorandum ADR proceedings are not admissible in evidence. However, regardless of what the post-Deal Point Memorandum ADR proceedings
 
 should
 
 have been, they were not treated as a mediation by either Weddington, the private judge, or the superior court. If they had been so treated, the judgment now being reversed would never have been entered. In view of this fact and our disposition reversing the judgment, we need not entertain the Evidence Code section 1152.5 issue further.
 

 *
 

 See footnote,
 
 ante,
 
 page 793.