Filed 2/17/26  Artus v. Gramercy Towers Condominium Assn. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| KAZUKO K. ARTUS, <br><br> Plaintiff and Appellant, <br> v. <br><br> GRAMERCY TOWERS CONDOMINIUM ASSOCIATION, <br><br> Defendant and Respondent. | A173068 <br><br> (San Francisco City & County Super. Ct. No. CGC-22-601819) |

Appellant, a long-time antagonist of her Condominium Homeowners Association, sued the Association.  On the day the case was called for trial, the parties participated in a lengthy settlement conference overseen by the Presiding Judge, at the conclusion of which the parties signed a nine-page "Settlement Agreement" (Settlement Agreement).  The settlement required approval by members of the Association; the approval was obtained; the settlement check was sent as provided for in the Agreement; and the check was cashed.  Appellant, apparently having a change of heart, took the position that the approval vote was invalid.  The Association moved to enforce the settlement.  The trial court granted the motion and entered judgment for the Association.  We affirm.

1

# BACKGROUND[1]

## The General Setting

Gramercy Towers is a residential condominium development in San Francisco. It is governed by Gramercy Towers Condominium Association (usually the Association, sometimes GTCA), a nonprofit mutual benefit corporation founded under the Davis-Stirling Common Interest Development Act (Davis-Stirling Act; Civil Code § 4000 et seq.) run by volunteers. Gramercy Towers itself is managed by Principle AMC, a property management company, and David Gallaher, a Principle employee, is an on-site general manager at the premises. Gallaher helps oversee the day-to-day operations as well as provide technical support for members who attend Association board meetings.

Kazuko K. Artus, Ph.D., J.D., (Dr. Artus) owned three units at Gramercy Towers, and as such is a member of the Association. Over the years Dr. Artus has filed many lawsuits against the Association, as manifest by our observation in *Artus I* that her disputes "generated three prior lawsuits by her, one of which led to a published opinion by Division One of this court affirming a ruling by the San Francisco Superior Court that denied Dr. Artus injunctive and declaratory relief and her claim to attorney fees: *Artus v. Gramercy Towers Condominium Assn.* (2018) 19 Cal.App.5th 923 . . ." (*Artus I*, *supra*, 76 Cal.App.5th at p. 1047.)[2]

We ended our opinion in *Artus I* quoting the esteemed trial Judge

---

[1]     Some of the background is taken from our opinion in an earlier case brought by appellant: *Artus v. Gramercy Towers Condominium Association* (2022) 76 Cal.App.5th 1043 (*Artus I*).

[2]     The Association's brief states that Dr. Artus has filed seven lawsuits, but cites nothing in support.

Harold Kahn who implored the parties with this: " 'Sad to say, unless the past is a poor predictor of the future or the parties are no longer able or willing to devote the huge resources they have devoted previously, it is likely that there will be a fifth *Artus v. GTCA* lawsuit. This fourth lawsuit, especially the way it concluded, accomplished little or nothing to prevent that from occurring. In that regard, I conclude this order by repeating a statement I made almost three years ago at the final hearing in the third *Artus v. GTCA* lawsuit: "I'm aware that there has been a long history of disputes between Dr. Artus and this association, I'm trying to send a message here. And that message is, don't run to court. Run to try to work things out. Both sides." ' " (*Artus I*, *supra*, 76 Cal.App.5th at p. 1061.)

To that sentiment, we added our own "Amen." (*Artus I, supra*, 76 Cal.App.5th at p. 1061.)

*Artus I* was filed in March 2022. A few months later Dr. Artus filed this case.

### *The Lawsuit Here*

According to Dr. Artus's later-filed declaration, she filed the complaint in this action on September 12, 2022, and later the operative second amended complaint.[3] It named the Association and was styled as "1) Violation of Civil Code §[ ]4090 and § 4900 et seq."; "2) Violation of Civil Code § 5450"; and "3) Declaratory Relief." (Emphasis omitted.)

The case was set for trial on October 21, 2024, and at the trial call both sides agreed to a settlement conference. The conference lasted all day, overseen by Presiding Judge Anne-Christine Massullo. And the conference ended with a settlement, memorialized that day in a nine-page, typewritten

---

[3]     The complaint is not in the record.

3

"Settlement Agreement" entered into by Dr. Artus and the Association.

The Agreement begins with a page of recitals, which are followed by seven pages of terms. All seven pages bear four sets of initials, which we assume are those of Dr. Artus and the three Association representatives who signed the agreement. The Agreement was signed by Dr. Artus and approved as to form by her attorney, and by the Association via its president, vice-president, and secretary, and approved as to form by its attorney.

As pertinent to the issues here, the Settlement Agreement provided as follows:

"This agreement is fully binding and enforceable on the parties, subject to the approval of the settlement by the GTCA Board."

The notice for the Board meeting approving the settlement, including the Notice Committee, was to be approved by the attorneys for both parties. But "[i]f counsel are unable to reach an agreement by November 1, 2024, then any concerns regarding the notice shall be resolved by Judge Massullo with final and binding authority on the notice."

GTCA was to attach an acknowledgment to the Board meeting notice and minutes that some of the prior meeting notices did not comply with the Davis-Stirling Act.

Within seven days of executing the Settlement Agreement, Dr. Artus was to file a notice of conditional settlement and submit a stipulation to the trial court to retain jurisdiction pursuant to Code of Civil Procedure section 664.6.

Within 30 days, GTCA agreed to create a "Notice Committee" to be chaired by Dr. Artus. The purpose of the Committee was to recommend a template for future notices of GTCA meetings. Dr. Artus was prohibited from pursuing future legal action against GTCA if the association adopted meeting

4

notices that were created by the Notice Committee, a provision apparently included to address Dr. Artus's concerns of deficient meeting notices.

Within 30 days of the Board approval of the Settlement Agreement, the Association shall remit payment of $30,000 to Dr. Artus.[4]

Within 30 days of receiving payment, Dr. Artus shall file a dismissal with prejudice.

On October 24, the Association's attorney sent Dr. Artus's attorney a draft meeting notice for a November 12 Board meeting to approve the settlement and notice to membership announcing the Notice Committee. Dr. Artus's attorney failed to provide any comments or meet and confer concerning the documents by the deadline in the Settlement Agreement. So, the Association's attorney contacted Dr. Artus's attorneys, who advised they had no authority to comment, and would not provide any comments or any proposed alternative notice.

On November 1, the Association's attorney submitted the proposed notice and materials to Judge Massullo.

The next day, a Saturday, Dr. Artus's attorney sent a proposed notice to the Association's attorney.

On November 6, the Association's attorney sent its proposed notice along with Dr. Artus's proposed notice to Judge Massullo for consideration. Later that day, Judge Massullo approved the Association's notice, doing so with the observation that "[a]fter reviewing the settlement agreement, which includes a November 1, 2024 deadline, and based on the submissions, the Court approves GTCA's form of notice."

As noted, the materials indicated that the Board meeting was to be

---

[4]    The $30,000 amount was written in by hand. The original typed amount was $10,000.

held on November 12. On November 8, the Association sent to all Association members the meeting notice in the form approved by Judge Massullo, along with an agenda. The notice provided a Zoom link and phone number to connect the meeting, and instructed members to contact Gallaher if they had technical difficulties, providing his telephone number and email address.

At 5:45 p.m. on November 12, before the 6:30 p.m. start time, Dr. Artus emailed Gallaher asking how to "show hand" in order to speak at the meeting. Gallaher responded with instructions on how to raise and lower her hand. Dr. Artus logged into the meeting via Zoom, but at some point left the meeting and did not request further assistance. Nevertheless, at 6:38 p.m., Gallaher emailed Artus offering additional technical assistance. He received no response.

The Board unanimously approved the settlement.

On November 15, the Association sent all members a notice with several enclosures as set forth in the settlement agreement: a copy of the Settlement Agreement; notice the Board approved the Settlement Agreement; an acknowledgment that some prior notices did not comply with the Davis-Stirling Act; the announcement of the Notice Committee; and a list of board members, committees, and committee members.

On December 4, Dr. Artus's counsel sent a letter claiming the Settlement Agreement had no effect because it was not approved by the Board, asserting that the November 12 notice and meeting did not meet the requirements of Civil Code sections 4090 and 4926. The letter also claimed that Dr. Artus was unable to participate in the meeting.

On December 6, the Association's attorney responded, asserting that the notice for the meeting was approved by Judge Massullo, and that Dr. Artus did in fact log into the meeting. The letter also stated that if Dr. Artus

6

did not comply with her duties under the Settlement Agreement, the Association would file a motion to enforce it.

On December 9, the $30,000 settlement check was mailed to the offices of Dr. Artus's attorney, where it was deposited into their account.

By letter dated January 13, 2025, Dr. Artus's attorney sent a check to the Association in the amount of $30,000. The letter claimed the Association's settlement check was "deposited for payment by an oversight," and in it Dr. Artus reiterated her position that the November 12 meeting and notice were invalid, and that she did not receive a timely copy of the meeting minutes she requested on January 8, 2025—this, despite that the minutes had been provided to her attorney.

**The Motions to Enforce the Settlement**

On February 2, the Association filed a motion to enforce settlement pursuant to Code of Civil Procedure section 664.6 and a request for attorney fees and costs. The motion was accompanied by three declarations, of Gallaher and Christina McCandless. Those declarations set forth in detail the events described above and authenticated all relevant documents. The motion was scheduled for March 13.

On February 19, Dr. Artus filed her own motion to enforce or, in the alternative, set aside and vacate the Settlement Agreement. Dr. Artus's motion was scheduled for the same day.

Both sides filed oppositions, both sides replies, and the motions came on for hearing as scheduled before a most experienced judge, the Honorable Harry L. Jacobs, a long-retired judge sitting by assignment, a "visiting judge" as he put it. Judge Jacobs had issued a tentative ruling granting the Association's motion and denying Dr. Artus's, and heard argument, however benevolently, including from two attorneys for Dr. Artus. At the conclusion of

7

the argument, Judge Jacobs concluded as follows:

"This is an interesting case.

"Well, I'm not exactly sure why this is being fought over since there was an agreement and it seems like everybody got what they wanted. But obviously it's being fought over.

"I think that plaintiff's interpretation of that 2 C statute is tortured, and quite frankly, I think their position regarding the conduct of the meeting is unreasonable.

"That's why the tentative ruling will be adopted as the ruling of the Court, meaning that the defendant's motion to enforce settlement is granted.

"Your request for attorney's fees which I find appropriate is granted. Plaintiff's motion to enforce or set aside the settlement agreement is denied."

On March 13, Judge Jacobs signed an order granting the Association's motion and awarding $7,525 in attorney fees and costs. He also entered judgment against Dr. Artus. On April 2, Dr. Artus filed a notice of appeal.

## DISCUSSION

### Introduction and Overview

After lengthy efforts, Dr. Artus and the Association settled the lawsuit under which Dr. Artus would receive $30,000 and she would dismiss the case. Standard stuff. The only wrinkle here was that the settlement would be effective upon Board approval, a provision that we understand is occasionally necessary when an agreed-to settlement must be approved, as, for example, when a municipal entity's representative agrees to settle a tort claim, but the settlement must be approved by the responsible authority, like a Board of Supervisors or City Council. And, of course, one would expect that the person receiving the agreed-upon settlement amount would hope that the approval would be forthcoming. But not Dr. Artus. Contrary to all one would expect—

8

not to mention that the settlement check was cashed—Dr. Artus had some change of heart and changed entirely, taking an extreme, highly technical position that the Board approval was improper.

Judge Jacobs described Dr. Artus's position as "tortured," her position regarding the Board meeting "unreasonable." We wholeheartedly agree with Judge Jacobs's description, and we easily affirm his ruling, doing so in light of well-settled law and established public policy.

### The Judgment Confirming the Settlement Agreement Is Supported By the Record

Dr. Artus has filed a lengthy opening brief that includes what the index calls a "legal discussion" that lists four sub-parts, "B" through "E": (1) The "November 12, 2024 Gathering Was Not a Lawful Board Meeting" ; (2) The Davis-Stirling Act "Legislative History Supports [Her] Interpretation"; (3) "Enforcement Violated Due Process and Public Policy"; and (4) "The Hearing Record Confirms [Her] Legal and Factual Positions." The body of the brief lists a boldface-set argument as "A": "**Judgment Was Improper Because the Condition Precedent Was Not Met**."

We reject the arguments. But before explaining why, a few observations about Dr. Artus's briefing.

The Association's respondent's brief spends several pages criticizing Dr. Artus's brief for not properly citing to the clerk's transcript and for not complying with the rules of appealability. Dr. Artus's reply brief does not take issue with the criticism in any meaningful way, but rather asserts that the defects are "minor and non-prejudicial," going on to describe them as "technical issues which are not grounds to ignore" claimed legal error. We would not be so sanguine, especially as Dr. Artus's briefing is subject to criticism on other fronts, including its treatment of the facts.

We have set forth in detail the nine-page, typewritten Settlement

9

Agreement that resulted from the day-long efforts overseen by Judge Massullo, culminating in a Settlement Agreement signed by Dr. Artus and three officers of the Association and approved as to form by their attorneys. Given that, Dr. Artus's description of what occurred is troubling indeed, describing it this way: "In a mandatory settlement conference in October 2024, a possible settlement was considered. Respondent was represented by three directors. They represented that Respondent will have the Board approve the proposed settlement agreement in a board meeting on November[ ] 12[,] 2024." Or, as Dr. Artus puts it at another point, wondering—with apparent disdain—could anyone understand how an "enforceable settlement agreement existed merely because three of seven GTCA directors scribbled their names on a sheet of paper."

We also described above the events that followed the Agreement, including developments on November 12, which included Dr. Artus's appearance on the video and then her voluntary leaving. Despite that, her brief states she was "unable to join" the meeting, indeed, at one point saying she was "prevented from attending." Such lack of candor is not to be condoned.

We turn to the arguments in Dr. Artus's brief, and easily reject them under the well-settled general legal principles and standard of review.

Code of Civil Procedure section 664.6 (section 664.6) states in relevant part: "If parties to pending litigation stipulate, in a writing signed by the parties outside of the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement." (§ 664.6, subd. (a).)

The purpose of section 664.6 is "to provide a summary procedure for specifically enforcing a settlement contract without the need for a new

10

lawsuit." (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 809.) "If the court determines that the parties entered into an enforceable settlement, it should grant the motion and enter a formal judgment pursuant to the terms of the settlement." (*Hines v. Lukes* (2008) 167 Cal.App.4th 1174, 1182–1183.)

As to the standard of review, we recently confirmed it in *Greisman v. FCA US, LLC* (2024) 103 Cal.App.5th 1310, 1321–1322:

"On appeal, '[a] trial court's factual findings on a motion to enforce a settlement pursuant to section 664.6 are subject to limited appellate review and will not be disturbed if supported by substantial evidence.' (*Machado v. Myers* (2019) 39 Cal.App.5th 779, 790; accord, *In re Marriage of Assemi* (1994) 7 Cal.4th 896, 911.)

"Regarding the substantial evidence standard, the principles are well settled: ' "[T]he power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) . . . 'If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed.' (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) 'Our job is only to see if substantial evidence exists to support the [decision] in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events.' (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

"Legal questions, such as the proper interpretation of section 664.6 or

whether the granting of the motion satisfied the strict requirements of the statute, are reviewed de novo. (*J.B.B. Investment Partners, Ltd. v. Fair* (2014) 232 Cal.App.4th 974, 984 (*J.B.B.*).)"

The evidence here is set forth above in extensive detail. It includes the following:

- After extensive effort, Dr. Artus and the Association representatives signed a nine-page written Settlement Agreement, an agreement Dr. Artus's attorneys approved as to form;
- The Settlement Agreement had provisions for approval of the notice for the meeting;
- The Association circulated a draft meeting notice to Dr. Artus for her review;
- Neither Dr. Artus nor her lawyers responded in timely fashion with any complaints or suggestions.
- Judge Massullo considered the Association's proposed notice and Dr. Artus's tardy notice, and determined that the Association's notice should be used;
- The Association used the court-approved draft notice for the November 12 meeting;
- Dr. Artus asked for and received technical assistance;
- Dr. Artus attended on Zoom, but chose to voluntarily leave the Zoom conference;
- The Association sent the $30,000 settlement check; and
- Dr. Artus's attorneys cashed it.

That is substantial evidence.

Superimposed on all the above is the well-settled policy favoring settlements—a policy, not incidentally, mentioned in the Association's brief

and utterly ignored in Dr. Artus's reply.  As we put it a few months ago:

"We find support for our conclusion in 'well-established public policy' that settlements are favored and should be encouraged.  (*Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1338.)  As Division Five of this court described it, quoting two old Supreme Court cases: 'Public policy has long supported pretrial settlements.  "Not only will such agreements, when there is no fraud, be sustained by the courts, but they are highly favored as productive of peace and goodwill in the community, and reducing the expense and persistency of litigation."  (*McClure v. McClure* (1893) 100 Cal. 339, 343.)  In *Hamilton v. Oakland School Dist.* (1933) 219 Cal. 322, the Supreme Court reversed a judgment denying enforcement of a compromise, holding, "It must be remembered that it is the policy of the law to discourage litigation and to favor compromises of doubtful rights and controversies, made either in or out of court."  (*Id.*, at p. 329.)'  (*Gopal v. Yoshikawa* (1983) 147 Cal.App.3d 128, 130–131.)"  (*Birdsall v. Helfet* (2025) 113 Cal.App.5th 558, 570–571.)

Ignoring all that, Dr. Artus's brief devotes many pages going deep into claimed analyses of the Davis-Stirling Act; what she claims is required for teleconference meetings, claiming, for example, that there was not designated assistance," and that Gallaher was not "credentialed in teleconferencing"; and various and sundry minutiae she claims apply here.  We need not go into all that.  And we will not:  Dr. Artus has used up more than her share of California Court resources.[5]

---

[5]    Both parties in this case requested oral argument, which was set for February 13.  We distributed a tentative opinion, the effect of which was that any party who had requested oral argument was required to file an additional request for oral argument form, which had to be done by 11:00 a.m. on February 4.  On February 3 counsel for the Association advised that he did not wish to proceed with oral argument, and by email of February 4

**DISPOSITION**

The judgment is affirmed. The Association shall recover its costs on appeal.

---

counsel for Dr. Artus advised that he too did not wish to proceed with argument and that "they would be filing a request for dismissal as well." It has now been over two weeks and Dr. Artus has still not filed the request. No matter, as we would refuse to file it.

An appellant does not have an absolute right to dismiss an appeal once the record is filed in the appellate court. (See Cal. Rules of Court, rule 8.244(c)(2) ["court *may* dismiss the appeal," italics added]; *Greb v. Diamond Internat. Corp.* (2013) 56 Cal.4th 243, 247, fn. 3; see generally Eisenberg et. al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2025) ¶ 5:63 and cases there collected.) As noted, by the time Dr. Artus filed the request for dismissal, we had issued a tentative opinion that was adverse to Dr. Artus, an opinion that was also critical of her litigious nature—not to mention had some unfavorable comments about her advocacy in our court. "Appellate courts are disinclined to grant such an '11th hour' request to dismiss an appeal. [Citations.] . . . And, appellate courts are generally loath to dismiss an appeal when it appears the dismissal is calculated to derail the creation of unfavorable precedent. (See *Lucich v. City of Oakland* (1993) 19 Cal.App.4th 494, 501–503; 9 Witkin, Cal. Procedure (6th ed. 2021) Appeal, § 764, pp. 785–788.)" (*65283 Two Bunch Palms Building LLC v. Coastal Harvest II, LLC* (2023) 91 Cal.App.5th 162, 167, fn. 1.)

14

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A173068)

15